STROUD, Judge.
*377 Defendant-father appeals from a permanent custody order which grants sole custody of the parties' daughter to plaintiff-mother and eliminates his visitation privileges. The trial court made extensive findings of fact regarding the many reasons it determined in its discretion that continuing visitation is not in the child's best interest. The order on appeal is the last in a series of orders in which the trial court used every possible method to help and encourage Father to address his mental health and domestic violence problems and provided visitation with various conditions to protect the child. All of these attempts have failed because Father has consistently refused to take advantage of any opportunity ordered by the trial court to allow Father to resume visitation. Father has repeatedly failed to participate in counseling as ordered, to take medication as prescribed, to comply with the trial court's orders regarding public visitation and with the rules governing supervised visitation, and to protect the child from exposure to domestic violence in his relationship with his current wife. We affirm.
I. Background
Mother and Father were married in February of 2006 and are the parents of Susan,[1] who was born in September of 2006. The parties separated in 2008 and later divorced. Since the parties separated in 2008, the trial court entered several orders regarding custody and visitation. The trial court entered a temporary custody order in January of 2009, when Susan was two years old. The trial court found that Susan was having difficulty transitioning between the parties' homes and noted that Mother had consulted a child psychologist, but Father had not participated. The trial court found Father had been "overly emotional" when dropping Susan off at day care, making it difficult for her *378 to transition. In addition, Susan's regular pediatrician had refused to see her because of an incident in the office with Father. Susan had some significant chronic health problems, so continuity of her medical care was particularly important. The trial court also found that Father had been "unable to appropriately control his anger and other emotions" in front of Susan. The temporary order required Father to have a psychological evaluation with Dr. Reid Whiteside and to comply with any recommendations, including taking medication as prescribed.
After the psychological evaluation was done, the trial court entered a permanent custody order by consent on 5 October 2009 which gave Mother and Father joint legal *536 custody of Susan; Mother had primary physical custody, and Father had about six overnight visits in every two week period. Father was required to follow Dr. Whiteside's recommendations, including treatment with his personal therapist for at least two years and thereafter unless he was released from therapy. Father was ordered to continue to take his medication as prescribed and to continue to participate in family therapy. The consent order also provided for appointment of a parenting coordinator who was also a psychologist or psychiatrist to monitor any psychological issues relating to the parties' co-parenting; Dr. Alan Bloom was appointed.
On 31 July 2015, Mother filed a motion to modify custody based upon a substantial change in circumstances; she alleged, in part, that Father had willfully ignored the requirements of the consent order; refused to communicate with her; interfered with her custodial time; failed to provide proper care and supervision of the child; slept in the same bed with the child on a regular basis; failed to follow instructions from the child's physicians and dietician; and that he had been arrested for assault on a female on 1 June 2015. Mother also requested appointment of another parenting coordinator as Dr. Bloom's term had expired.
Before the motion for modification was heard, on 4 October 2015, Father's girlfriend, whom he later married, Karen Huml, contacted Mother and told her she "was in fear of" Father. Karen did not want Father to know she had contacted Mother, and she informed Mother of domestic violence in Father's home while Susan was present. On 7 October 2015, Mother filed a motion for emergency custody based upon the information that Susan had been uncontrollably crying when exposed to domestic violence in Father's home. The trial court entered an emergency custody order and set a return hearing for 12 October 2015. The emergency order limited Father's visitation to three hours, two days a week, in a public place such as a museum or mall, until a return hearing scheduled for 12 October 2015. Mother subpoenaed Karen for the *379 12 October 2015 hearing, and both she and Father requested a continuance, so the return hearing was set for 23 October 2015. On 23 October, Father did not appear for the hearing on time, and the trial court had resolved the matter before he arrived. The trial court entered a temporary order with the same visitation as in the emergency order.
On Thanksgiving night, 2015, Karen again contacted Mother "with photo attachments and messages that [Father] had injured" her. A few days later, Mother asked Father about the incident; he did not deny it, but Karen then said that Father had not injured her.
Father continued to bring Karen to his public visits with Susan, despite the domestic violence between them. On 10 December 2015, Father and Karen got married, but Mother did not learn of the marriage until she "received an anonymous email" on Christmas Eve. Mother allowed Susan to go to Father's home to open gifts on 26 December 2015. That night, back at her Mother's home, Susan wet the bed, although she had not had this problem in several years.
In January of 2016, Father " 'weaned' himself off his medication" because he felt " 'it takes away my life-I'll take the little ups and downs.' " On 3 April 2016, Father informed Mother that Karen had texted him "photographs of her forearms sliced up." Father called the police, and they discovered Karen was intoxicated. Karen made claims to the police that Father "was sexually inappropriate while in the presence of" Susan; she was then placed under a mental commitment. Hearing on Mother's pending motion to modify custody was scheduled for the next day, 4 April 2016.
At calendar call on 4 April 2016, Father informed the trial court he would be seeking a domestic violence protective order ("DVPO") against Karen. With the consent of the parties, the trial court entered a temporary custody consent order; this order appointed Dr. Cynthia Sortisio as a reunification therapist for Father and Susan; appointed a new parenting coordinator, Helen O'Shaunessy; and set up a three-tiered plan for gradually increasing Father's visitation. Father was also required to have another psychological evaluation; to comply with all recommendations, including any prescribed medication; and to continue attending and *537 to complete the DOSE domestic violence program.[2]
Father did not comply with the temporary custody consent order and never moved past the first tier of visitation, so his visits continued to *380 be public. Further, Father did not timely pay the parenting coordinator; failed to engage in any of the required therapy for over a year; and did not timely complete the parenting classes. Father also did not obtain a DVPO against Karen, but instead allowed her to "facetime" with Susan from his car during his public visits. In January 2017, Father completed the psychological evaluation ordered in April 2016.
In August of 2016, Mother hired an investigator because she was concerned that Father was not complying with the terms of the order regarding public visitation. The investigator confirmed that Father was removing Susan from the public locations where he was supposed to be visiting with Susan. Mother informed the reunification therapist and parenting coordinator, who notified Father this was not appropriate.
On 8 September 2016, Father was arrested again for assault on a female, against Karen. Karen sent the parenting coordinator voice recordings she claimed were of Father "making threats to kill" Mother. Karen also sent text messages she claimed were from Father threatening Judge Denning, the judge who entered the temporary custody consent order. The parenting coordinator informed the police of the threats, and they advised Mother to leave home and stay at an undisclosed location, which she and Susan did for about a week. On 21 November 2016, Mother also got an ex parte DVPO which extended into a permanent DVPO by consent. Judge Denning recused because of the threats, and a new family court judge was assigned. Because of safety concerns, neither the parenting coordinator nor Susan's therapist would meet with Father alone.
Because of the DVPO, Father could no longer exercise his public visits, and on 19 May 2017, Father began supervised visitation with Susan at Time Together. After Susan visited with Father, she "became withdrawn, cried uncontrollably, began to experience stomach pains, showed signed of anxiety and stress," to the extent that she missed school on 22 May 2017. At the June visit at Time Together, staff had to redirect Father for whispering to Susan. Susan again experienced extreme emotional distress after this visit. On 15 June 2017, Mother filed a motion to suspend Father's visitation.
The hearing on modification of custody was held on 19 July and 20 July 2017, and on 17 November of 2017, the trial court entered an "ORDER MODIFYING PERMANENT CUSTODY AND CHILD SUPPORT ORDER[;]" the order at issue on appeal. The trial court made extensive and detailed findings of fact, just a few of which we have summarized above. The trial court concluded there had been many substantial *381 changes in circumstances affecting the best interest of Susan; the trial court found these circumstances and detrimental changes in detail. Regarding violence the trial court found:
c. As a result of Defendant's actions since the entry of the prior Permanent Custody Order the Plaintiff is terrified of the Defendant and she has good cause to be afraid of the Defendant.
d. Since the entry of the prior Permanent Custody Order, at least on four separate occasions the Defendant made threatening statements about the Plaintiff which included statements regarding a murder/suicide, blowing her head wide open, snapping her neck and putting a strangle around her neck. These statements were laced with profanity and made explicit comments about having to take DOSE classes for 26 weeks, showing that Defendant took no responsibility for his own actions and emphasizing that Defendant has anger issues that he has never adequately addressed even after completing his DOSE classes in 2016.
....
*538 f. Defendant took a deferral plea for Assault on a Female related to [Karen] Huml in Wake County file no. 15 CR 212182 that was subsequently expunged, and as part of that deferral plea the Defendant was required to complete a DOSE program. The Defendant's anger and rage as heard by this Court in the voice recordings of the Defendant are disturbing; and Defendant's anger issues and refusal to appropriately address his anger have had a detrimental impact on not only the minor child to not feel safe around the Defendant but the Plaintiff, her parents, Plaintiff's friends, Plaintiff's co-workers and various professionals involved with this family.
....
s. Since the entry of the prior Permanent Custody Order, and starting around December 2014, Defendant was not transparent or forthcoming regarding the well-being of the minor child when she was in his care, *382 including, but limited [ (sic) ] to failing to inform the Plaintiff of the domestic violence in his home while their child was present, misrepresenting his location during public visitations, denying that he was still in a relationship with [Karen] Huml and such other matters set forth in these findings of fact. Defendant's actions related to these issues have had a detrimental impact on the minor child.
t. The Defendant has shown a consistent pattern of making poor parenting decisions including those referenced in the above findings of fact.
u. Defendant downplays and ignores the minor child's anxiety and/or stress. Defendant has been angry around the minor child and the child has experienced significant trauma related to the Defendant's actions.
v. Since the entry of the prior Permanent Custody Order and starting around December 2014 Defendant has exhibited inconsistent, unstable, and erratic behavior while providing care for the minor child.
The trial court also determined that Father "should not have any further contact with" Susan as a "direct result of his actions and his failure to take steps that could have improved his relationship with his daughter." The trial court also set out detailed findings regarding why Father should not have any custodial rights or visitation with Susan:
a. The April Temporary Order entered in 2016 gave the Defendant liberal visitation with the minor child and established a three tier visitation schedule. Defendant failed to take advantage of this opportunity to repair and rehabilitate his relationship with his daughter. There was a reunification therapist that was available to the Defendant for over a full calendar year (April 2016 to July 2017) and other than two initial phone calls in June 2016 and one meeting in July 2017 the Defendant did absolutely nothing to work with the reunification therapist to improve his relationship with his daughter. Defendant first met together with the reunification therapist and the minor child's therapist on July 17, 2017 two days before this hearing.
*383 b. The communication that the Defendant did have with the child's therapist was not productive. Defendant ignored recommendations that Defendant write a letter taking responsibility for everything in December 2016 in response to Defendant's attempt to send Christmas cards/correspondence to the minor child. In December 2016, Dr. Meisburger advised Defendant that he would need to send her written correspondence via postal mail and await her reply the same. After December 2016 until July 2017, there was no further contact between Dr. Meisburger and Defendant. Defendant failed to grasp that the recommendations from the child's therapist were based [on] the needs of the minor child. Defendant has continuously put his needs above the minor child's needs without concern for the detrimental impact his own actions had on the minor child.
c. Even after the DVPO was entered in November 2016 the Defendant had the ability to reach out to the reunification therapist and the child's therapist to *539 maintain a role in [Susan's] life. Defendant made the choice to do nothing.
d. Since July 2016 until his deposition in June 2017, Defendant paid no child support to the Plaintiff despite having an agreement to make payments to her. Defendant made a $ 400 payment in June 2017. Defendant ignored all medical bills, therapy bills, and healthcare related items for the minor child from July 2016 through the date of this hearing. Defendant was not concerned about anyone's well-being but his own.
e. Defendant's threats against the Plaintiff put the Plaintiff in a real fear of her life. Defendant's threats against the Plaintiff resulted in the Plaintiff and minor child having to go in hiding at hotels for a period of time. The threats from Defendant against Plaintiff resulted in Plaintiff's employer requiring her to work from home because of safety concerns at her employer's office. She was not allowed to return to work at her office from September 2016 through the date of this hearing. These threats by Defendant also resulted *384 in the minor child being restricted to be supervised by an adult while outside at her home. The minor child had to be advised of how to respond if Defendant appeared at her home at her mother's house, or school or any public location.
f. Under the DVPO the Defendant's visitation with the minor child was to be supervised at Time Together. Once Defendant started supervised visits at Time Together, Defendant's supervised visitation at Time Together had to stop as the result of the minor child's extremely negative reaction and behavior after these visits.
g. Defendant violated the supervised visitation rules that are imposed by Time Together. During his second visit Defendant whispered to the minor child and had to be redirected by the staff at Time Together. Defendant objected to Time Together visits because it was not "natural" and didn't allow him to be himself with his daughter.
This Court is not able to rule out that the Defendant has had inappropriate sexual contact with the minor child or rule out that Defendant has engaged [in] sexualized behavior in the minor child's presence.
h. Defendant has willfully ignored the Court Orders in his case regarding public visitation with the minor child. Plaintiff had to hire a private investigator to follow the Defendant during his public visitations because of Plaintiff's concerns that the Defendant was not following the requirement that Defendant's visit occur in a public location as most recently set forth in this Court's April Temporary Order. The private investigator observed the Defendant remov[ing] the minor child from specific public locations where he told the Plaintiff that he would be exercising his public visitation with the minor child. The Plaintiff's private investigator, Michael Flowers with Cat's Eye Investigations, found that the Defendant removed the minor child from these locations. On one such occasion as soon as Plaintiff dropped off the minor child for a visit the Defendant took the minor child and immediately exited the location through a side door *385 and walked through an adjacent building to ultimately take the minor child to a[ ] parking garage. During multiple visits, once the Defendant entered in the parking garage, the Defendant would get into rental car or truck.
Defendant would have already backed the rental car into a parking space[ ]. By removing the child from his public visitation this allowed the Defendant to be alone with the minor child. The private investigator could not determine that Defendant was facetiming, only that the minor child was looking at an iPad or mobile phone. This also allowed Defendant to have the minor child facetime with [Karen] Huml-another violation of the April Temporary Order. It is concerning that Defendant was removing the minor child from public and taking her to locations where she was isolated and sitting in the back seat of a rental car with the Defendant. Defendant's explanation *540 about backing into parking spaces, using a rental car instead of his personal vehicle, and insisting that Defendant and the minor child had to eat food that he prepared at home in the back seat of a vehicle rather than at the public location was not credible. The private investigator also observed an angry outburst by the Defendant while he was with the minor child at the IMAX movie theater in Raleigh which was directed toward an employee working at the IMAX theater. On another occasion, the private investigator observed the minor child crying while she was walking with the Defendant in public.
i. Based on the foregoing findings of fact the Defendant cannot put the needs of the minor child first. Defendant blames everyone but himself. Defendant does not take responsibility for his actions. Defendant is very smart. Defendant took steps during his public visits with the minor child to do what he wanted to do while ignoring restrictions that were in place to protect the minor child. It is impossible to believe that Defendant did not know that his actions would have a detrimental impact on the minor child.
j. It is in the child's best interests and welfare of the minor child that she have no further contact with *386 the Defendant. The minor child's anxiety and stress level decreases when the child has no contact with Defendant. The minor child's physical symptoms such as stomach pains also are eliminated when she does not have contact with Defendant. The minor child performed exceptionally well in school, including being accepted to the Duke University TIPS program.
k. The Plaintiff and minor child have reasons to fear the Defendant.
l. For almost two years the Defendant has failed to take opportunities to change his behavior and to be a positive influence in his daughter's life. Defendant has failed to take the opportunity to exercise visitations with his child, and when he did take those visits he repeatedly violated court orders concerning the restrictions placed on him to including, but not limited to, removing the minor child from public visits, exposing the child to [Karen] Huml, and failing to follow the clear rules established at Time Together.
m. As the direct result of his actions, confrontational attitude and failure to act in a manner consistent with his parental responsibilities to provide support, love, and guidance, the Defendant has had a detrimental influence on his daughter since at least July 2015.
The trial court concluded:
4. There has been a substantial change in circumstances warranting a modification of custody as set forth herein.
5. Plaintiff is a fit and proper person to have sole legal and exclusive physical custody of the minor child as set forth herein.
6. Defendant is a not a fit and proper person to have any visitation or contact with the minor child as set forth herein.
7. This Order is in the best interests and welfare of the minor child.
*387 The trial court decreed:
2. Defendant shall not have any custodial time with the minor child.
3. Defendant shall have no contact with the minor child. Defendant shall not be allowed to speak with the minor child. Defendant shall not be allowed to communicate to the minor child in any format, including, but not limited to, no letters, no *541 email, no text messaging, no face-to-face communication, and no telephone calls.
4. Defendant shall not have any access to the minor child. Defendant shall not have the ability to obtain any information concerning the minor child including, but not limited to, requesting information through third party care givers, teachers, medical professionals, instructors or coaches.
5. Defendant shall have no contact with the Plaintiff. Defendant shall not be allowed to speak with the Plaintiff. Defendant shall not be allowed to communicate with the Plaintiff in any format, including, but not limited to, no letters, no email, no text messaging, no face-to-face communication, and no telephone calls.
Father timely filed notice of appeal from this order.
II. Standard of Review
In Shipman v. Shipman , our Supreme Court set forth the requirements for modification of a custody order, and this Court's standard of review of an order modifying custody. See Shipman v. Shipman , 357 N.C. 471, 473-75, 586 S.E.2d 250, 253-54 (2003).
It is well established in this jurisdiction that a trial court may order a modification of an existing child custody order between two natural parents if the party moving for modification shows that a substantial change of circumstances affecting the welfare of the child warrants a change in custody. The party seeking to modify a custody order need not allege that the change in circumstances had an adverse effect on the child. While allegations concerning adversity are acceptable factors for the trial court to consider and will support modification, a showing of *388 a change in circumstances that is, or is likely to be, beneficial to the child may also warrant a change in custody.
As in most child custody proceedings, a trial court's principal objective is to measure whether a change in custody will serve to promote the child's best interests. Therefore, if the trial court does indeed determine that a substantial change in circumstances affects the welfare of the child, it may only modify the existing custody order if it further concludes that a change in custody is in the child's best interests.
The trial court's examination of whether to modify an existing child custody order is twofold. The trial court must determine whether there was a change in circumstances and then must examine whether such a change affected the minor child. If the trial court concludes either that a substantial change has not occurred or that a substantial change did occur but that it did not affect the minor child's welfare, the court's examination ends, and no modification can be ordered. If, however, the trial court determines that there has been a substantial change in circumstances and that the change affected the welfare of the child, the court must then examine whether a change in custody is in the child's best interests. If the trial court concludes that modification is in the child's best interests, only then may the court order a modification of the original custody order.
When reviewing a trial court's decision to grant or deny a motion for the modification of an existing child custody order, the appellate courts must examine the trial court's findings of fact to determine whether they are supported by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.
Our trial courts are vested with broad discretion in child custody matters. This discretion is based upon the trial courts' opportunity to see the parties; to hear the witnesses; and to detect tenors, tones, and flavors that are lost in the bare printed record read months later by appellate judges. Accordingly, should we conclude that there is substantial evidence in the record to support the trial court's findings of fact, such findings are conclusive on *389 appeal, even if record evidence might sustain findings to the contrary.
In addition to evaluating whether a trial court's findings of fact are supported by substantial evidence, this Court must determine if the trial court's factual findings support its conclusions of law. With regard to the trial court's conclusions of law, our case law indicates that the trial court must determine whether there has been a substantial change in circumstances and whether that change affected the minor child. Upon concluding that such a change affects the child's welfare, the trial court must then decide whether a modification of custody was in the child's best interests. If we determine that the trial court has properly concluded that the facts show that a substantial change of circumstances has affected the welfare of the minor child and that modification was in the child's best interests, we will defer to the trial court's *542 judgment and not disturb its decision to modify an existing custody agreement.
Id. (citations, quotation marks, and brackets omitted).
III. Issues and Analysis
Father first argues "the trial court erred in failing to make sufficient factual findings regarding the best interest of the child[,]" (original in all caps), but Father's approximately one-page argument on this issue does not address best interests at all.[3] Instead, Father contends two portions of findings of fact regarding possible inappropriate sexual contact between Father and Susan are not supported by the evidence.
A. Findings of Fact
The two challenged portions of the findings are, "Plaintiff was alerted to the fact that Defendant was exhibiting 'grooming' behaviors toward his daughter" and "[t]his Court is not able to rule out that the Defendant has had inappropriate sexual contact with the minor child or rule out that Defendant has engaged in sexualized behavior in the minor child's presence."
*390 But the trial court did not find that any inappropriate sexual contact or behavior actually happened. Also, while Father claims that the "grooming" finding is "a bare recitation of Appellee's testimony" it is more properly characterized as the trial court's summary of Mother's extensive testimony regarding her concerns about Father's actions toward Susan. And Father contends the "inappropriate sexual contact" finding "fails to acknowledge the conflicting testimony of the therapist or the CPS investigation," but the finding actually notes the conflict by stating that the trial court "cannot rule out" the behavior. In other words, the trial court was concerned about the possibility of inappropriate sexual behavior but the evidence was not sufficient for the trial court to make a finding it had occurred or had not occurred.
Furthermore, even if these two portions of findings were omitted, the trial court's conclusions of law would still be supported by the remaining abundant and detailed findings of fact. Thus, this argument is overruled. But Father challenges a few other findings of fact, and his challenge is based only upon the admission of the recordings of phone conversations, so we will next address that issue.
B. Admission of Recordings
Defendant argues that "[t]he trial court erred in admitting the recorded conversations submitted as Plaintiff-Appellee's exhibits #1-4 as the recordings were insufficiently authenticated and the admission of the evidence was prejudicial to Appellant." The recordings were mentioned many times during the testimony of witnesses. Dr. Diane Meisburger, Susan's therapist, testified about her reasons for concern about Susan's safety; one reason for her concern was Father's statements in the recordings threatening to kill Mother and his cursing about being required to go to an anger management program. At this point, the recordings themselves were not played or introduced but were discussed only as part of the information Dr. Meisburger had considered. Father's attorney objected, "We haven't heard this recording. Again, we are talking about something that has not been entered into evidence, hasn't been offered. There is no foundation. I don't think it is appropriate for her to speak to it." Mother's attorney responded that Father's attorney had "opened the door" for it when she asked about the basis for Dr. Meisburger's testimony about concern for Susan's safety. The trial court allowed this line of questioning without further objection.
Later in the trial, other witnesses also testified about hearing the recordings and their responses to the recordings; Father did not object. For example, Mother first learned about the recordings when the *391 parenting coordinator was notified by Karen that Father "had threatened to kill [Mother] three *543 different" ways. Based upon these threats, Mother contacted the police and "went into hiding," staying out of town at a hotel in an undisclosed location. Mother actually heard the recordings a few days later at her attorney's office. Based upon these threats, Mother filed for a Domestic Violence Protective Order on 14 September 2016. Mother had also learned that Father was arrested for assault on a female involving Karen on 8 September 2016; this was his second arrest for assaulting Karen.
Mother testified that she could recognize the voice on the recordings as Father. Mother's counsel then presented the recordings themselves as exhibits and moved for admission into evidence, noting that "Mr. Huml has heard this. He has heard the recordings. Any authentication issue, if he is saying it is not him, then he can testify to that, but she is able to ident - authenticate his voice and identify it." Father's counsel did not dispute she had heard the recordings and did not raise any further question regarding authentication or any other objection. The recordings were then played, and Mother testified about each one.
Father has waived his argument regarding admission of the recordings as he did not object to the admission of any of the recordings.
In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection, or motion.
N.C. App. P. 10(a)(1); see Hoover v. Hoover , --- N.C. App. ----, ----, 788 S.E.2d 615, 618, disc. review denied , 369 N.C. 187, 794 S.E.2d 519 (2016) ("As a general rule, the failure to raise an alleged error in the trial court waives the right to raise it for the first time on appeal." (citation and quotation marks omitted)). Father does not argue that the findings of fact based upon the recordings are not supported by that evidence. Therefore, the trial court did not err in allowing the recordings to be admitted as evidence, and all of the trial court's findings of fact were supported by the evidence. This argument is without merit.
C. Denial of Contact with the Child
Father next contends "the trial court erred in denying [him] access to any contact with or information concerning" Susan. (Original in all *392 caps.) Father argues that he "has been barred from access to any information which would allow him to seek modification of the Order in the future." Specifically, Father claims these paragraphs of the decree "remove[ ] all of [Father's] remaining parental rights with respect to access to any information concerning" Susan:
2. Defendant shall not have any custodial time with the minor child.
3. Defendant shall have no contact with the minor child. Defendant shall not be allowed to speak with the minor child. Defendant shall not be allowed to communicate to the minor child in any format, including, but not limited to, no letters, no email, no text messaging, no face-to-face communication, and no telephone calls.
4. Defendant shall not have any access to the minor child. Defendant shall not have the ability to obtain any information concerning the minor child including, but not limited to, requesting information through third party care givers, teachers, medical professionals, instructors or coaches.
5. Defendant shall have no contact with the Plaintiff. Defendant shall not be allowed to speak with the Plaintiff. Defendant shall not be allowed to communicate with the Plaintiff in any format, including, but not limited to, no letters, no email, no text messaging, no face-to-face communication, and no telephone calls.
....
11. Should the Plaintiff desire to relocate with the minor child, she shall not be required to provide any information to the Defendant. Plaintiff shall be allowed to pursue any additional privacy *544 protections as allowed for victims of domestic violence.
Father also argues that the order is "the functional equivalent of the termination of his parental rights." Father cites only " Pulliam v. Smith , 348 N.C. 616, 501 S.E.2d 898, 900 (1998) .... and N.C.G. S. § 50-13.7(a)" in support of his argument, though it is not entirely clear how they relate to his argument; Father seems to be contending that without access to information about Susan he would never be able to seek modification of custody, so his parental rights have been effectively terminated.
*393 We first note that after briefs in this case were filed and the case was heard, this Court issued an opinion, Routten v. Routten , --- N.C. App. ----, 822 S.E.2d 436 (2018) (COA17-1360), which appears to establish a different standard for denial of visitation to a parent than prescribed by well-established North Carolina Supreme Court and Court of Appeals precedent.[4] See, e.g. , Owenby v. Young , 357 N.C. 142, 579 S.E.2d 264 (2003) ; Adams v. Tessener , 354 N.C. 57, 550 S.E.2d 499 (2001) ; Price v. Howard , 346 N.C. 68, 484 S.E.2d 528 (1997) ; Petersen v. Rogers , 337 N.C. 397, 445 S.E.2d 901 (1994). Throughout the opinion and in its conclusion, Routten relies on Owenby , see Routten, --- N.C. App. at ----, 822 S.E.2d at ----, but fails to note that Owenby involved a dispute between a parent and a non-parent third party, and that the Supreme Court explicitly stated that "the protected right is irrelevant in a custody proceeding between two natural parents, whether biological or adoptive, or between two parties who are not natural parents. In such instances, the trial court must determine custody using the best interest of the child test ." Owenby, 357 N.C. at 142-45, 579 S.E.2d at 265-67 (emphasis added) (citation and quotation marks omitted). Other Supreme Court cases cited by Routten , see generally Routten , --- N.C. App. ----, 822 S.E.2d 436, unlike Routten itself, also distinguish between the standards applicable to custody disputes between two parents (or two non-parents) and a parent versus a non-parent. See Adams , 354 N.C. at 58-61, 550 S.E.2d at 500-02 (involving a custody dispute between parents and grandparents and providing that "[i]n a custody proceeding between two natural parents (including biological or adoptive parents), or between two parties who are not natural parents, the trial court must determine custody based on the best interest of the child test. Price , however, involved a custody dispute between a natural parent and a third party who is not a natural parent. After acknowledging the Petersen presumption-that natural parents have a constitutionally protected, paramount right to custody of their children-we conducted a due-process analysis in which the parent's well-established paramount interest in the custody and care of the child is balanced against the State's well-established interest in protecting the welfare of children") (emphasis added) (citations and quotation marks omitted)); see also Price , 346 N.C. at 71-72, 484 S.E.2d at 529-30 (involving a custody dispute between a parent and a non-parent and noting, "[t]he General Assembly has prescribed the standard to be applied in a custody proceeding in North Carolina in N.C.G.S. § 50-13.2, which provides that an order for custody of a minor child entered pursuant to *394 this section shall award the custody of such child to such person, agency, organization or institution as will best promote the interest and welfare of the child. Therefore, in a custody dispute between two natural parents (we intend this phrase to include both biological and adoptive parents) or between two parties who are not natural parents, this best interest of the child test must be applied. The case now before us, however, is between a natural parent and a third party who is not a natural parent ") (emphasis added) (citation and quotation marks omitted); Petersen , 337 N.C. at 399-404, 445 S.E.2d at 902-05 (involving a custody dispute between adoptive parents and natural parents after adoption was declared void and stating, "[f]urther, plaintiffs argue that as to parents' custodial rights, our law recognizes no more than a higher evidentiary standard which must apply in custody disputes between parents *545 and those who are not natural parents; but the welfare of the child is paramount to all common law preferential rights of the parents. In light of Reno v. Flores , 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993), Stanley , and the principles enunciated in Jolly v. Queen , 264 N.C. 711, 142 S.E.2d 592 (1965) and In re Hughes , 254 N.C. 434, 119 S.E.2d 189 (1961), we explicitly reject these arguments. We hold that absent a finding that parents (i) are unfit or (ii) have neglected the welfare of their children, the constitutionally-protected paramount right of parents to custody, care, and control of their children must prevail. Language to the contrary in Best v. Best , 81 N.C. App. at 342, 344 S.E.2d at 367, is hereby expressly disavowed." (quotation marks omitted)).
Further, recent publication of Routten exacerbates the quandary presented by In re Civil Penalty , 324 N.C. 373, 379 S.E.2d 30 (1989), as noted by the dissent in Routten :
At first glance, this approach might seem appropriate. After all, In re Civil Penalty tells us that one panel cannot overrule another on the same issue. If it appears a second panel did precisely that by refusing to follow the precedent set by the first panel, should the third panel faced with the issue not ignore the second and follow the first? But, what if a fourth panel comes along and concludes that the second panel properly distinguished or limited the first panel? That fourth panel could refuse to follow the third panel on the ground that it improperly overruled the second.
Routten , --- N.C. App. at ----, 822 S.E.2d at 449 (Inman, J., dissenting) (citation omitted).[5] "Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of *395 the same court is bound by that precedent, unless it has been overturned by a higher court." In re Civil Penalty , 324 N.C. at 384, 379 S.E.2d at 37. The dilemma of In Re Civil Penalty arises when panels of this Court have decided the same issue two different ways, since we are theoretically bound by two opposing precedents or lines of precedent. And the Court may have a double dilemma where a prior panel of this Court has addressed not only the underlying issue but also the effect of In Re Civil Penalty on the same issue in different ways. See Routten , --- N.C. App. at ----, 822 S.E.2d at 449 (Berger, J., concurring) ("As the case before us here demonstrates, this Court can be trapped in a chaotic loop as different panels disagree, not only on the interpretation of the law, but also on what law appropriately controls the issue."). We have that double dilemma here, since this Court addressed the same issue and application of In re Civil Penalty in Respess , see Respess v. Respess , 232 N.C. App. 611, 754 S.E.2d 691 (2014), coming to one conclusion in 2014, and in Routten , coming to the opposite conclusion, in 2018. See Routten , --- N.C. App. ----, 822 S.E.2d 436.
Yet we must resolve this double dilemma, and we conclude Respess is the precedent which must be followed. Where there is a conflict in cases issued by this Court addressing an issue, we are bound to follow the "earliest relevant opinion" to resolve the conflict:
Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court. Further, our Supreme Court has clarified that, where there is a conflicting line of cases, a panel of this Court should follow the older of those two lines. With that in mind, we find Skipper and Vaughn are irreconcilable on this point of law and, as such, constitute a conflicting line of cases. Because Vaughn is the older of those two cases, we employ its reasoning here.
State v. Gardner , 225 N.C. App. 161, 169, 736 S.E.2d 826, 832 (2013) (citations and quotation marks omitted). Thus, we turn to Respess . See Respess , 232 N.C. App. 611, 754 S.E.2d 691.
*546 In 2014, this Court addressed the same issue as to the required standard of proof in a custody dispute between two parents and findings necessary to deny visitation in Respess :
*396 Although courts seldom deny visitation rights to a noncustodial parent, a trial court may do so if it is in the best interests of the child:
The welfare of a child is always to be treated as the paramount consideration. Courts are generally reluctant to deny all visitation rights to the divorced parent of a child of tender age, but it is generally agreed that visitation rights should not be permitted to jeopardize a child's welfare.
This principle is codified in N.C. Gen. Stat. § 50-13.5(i), which provides that:
In any case in which an award of child custody is made in a district court, the trial judge, prior to denying a parent the right of reasonable visitation, shall make a written finding of fact that the parent being denied visitation rights is an unfit person to visit the child or that such visitation rights are not in the best interest of the child.
The statutory language is straightforward and unambiguous and requires that if a trial court does not grant reasonable visitation to a parent, its order must include a finding either that the parent is an unfit person to visit the child or that visitation with the parent is not in the best interest of the child. Although our Supreme Court has not issued an opinion discussing this statute, during the past 30 years this Court has issued numerous opinions applying N.C. Gen. Stat. § 50-13.5(i). For example, in King v. Demo , 40 N.C. App. 661, 666-667, 253 S.E.2d 616, 620 (1979), we stated that:
Unless the child's welfare would be jeopardized, courts should be generally reluctant to deny all visitation rights to the divorced parent of a child of tender age. Moreover, G.S. 50-13.5(i) provides that prior to denying a parent the right of reasonable visitation, the trial court shall make a written finding of fact that the parent being denied visitation rights is an unfit person to visit the child or that such visitation rights are not in the best interest of the child.
And, in Johnson v. Johnson , 45 N.C. App. 644, 647, 263 S.E.2d 822, 824 (1980), we held that:
*397 In awarding visitation privileges the court should be controlled by the same principle which governs the award of primary custody, that is, that the best interest and welfare of the child is the paramount consideration. G.S. 50-13.5(i) provides that in any case in which an award of child custody is made in a district court, the trial judge, prior to denying a parent the right of reasonable visitation, shall make a written finding of fact that the parent being denied visitation rights is an unfit person to visit the child or that such visitation rights are not in the best interest of the child.
During the 33 years since Johnson was decided, we have consistently followed both its application of the best interests standard to disputes between parents regarding child custody and visitation, and its acceptance of the plain language of N.C. Gen. Stat. § 50-13.5(i).
Id. at 615-17, 754 S.E.2d at 696-97 (citations, quotation marks, ellipses, and brackets omitted).
The Respess court addressed the same issue arguably presented here based upon a conflict in the cases created by Moore v. Moore and determined that under In Re Civil Penalty it was bound to follow the consistent precedents prior to Moore and the plain language of North Carolina General Statute § 50-13.5(i). See id. at 615-17, 754 S.E.2d at 695-97. We are likewise bound to follow Respess , since it addressed the same underlying issue and analysis of a conflict in the cases under In Re Civil Penalty as we do here, see id. , 232 N.C. App. 611, 754 S.E.2d 691, since it was decided in 2014 and Routten in 2018. See Routten , --- N.C. App. ----, 822 S.E.2d 436.
Addressing Father's argument and our dissenting colleague's position that the order on appeal effectively terminates his parental rights, we first note that a custody *547 proceeding under Chapter 50 is neither functionally nor legally the equivalent of a proceeding for termination of parental rights. Contrast with N.C. Gen. Stat. Chap. 50; Chap. 7B (2017). Custody proceedings under Chapter 50 differ procedurally and substantively from a proceeding to terminate parental rights under Article 11 of Chapter 7B, from the initiation of the actions to the end results. Contrast with N.C. Gen. Stat. Chap. 50; Chap. 7B (2017). Further, the procedures set forth by Chapter 7B control over any conflicting procedures set out by the Rules of Civil Procedure. See *398 Matter of Peirce , 53 N.C. App. 373, 380, 281 S.E.2d 198, 203 (1981) ("Due to the legislature's prefatory statement in G.S. 7A-289.22 with regard to its intent to establish judicial procedures for the termination of parental rights, and due to the specificity of the procedural rules set out in the article, we think the legislative intent was that G.S., Chap. 7A, Art. 24-B, exclusively control the procedure to be followed in the termination of parental rights. It was not the intent that the requirements of the basic rules of civil procedure of G.S. 1A-1 be superimposed upon the requirements of G.S., Chap. 7A, Art. 24-B.").
Before ordering termination of parental rights, the trial court must find specific grounds as provided by North Carolina General Statute § 7B-1111 by clear, cogent, and convincing evidence and must find that termination is in the child's best interest. See In re C.C. , 173 N.C. App. 375, 380, 618 S.E.2d 813, 817 (2005) ("A proceeding to terminate parental rights is a two step process with an adjudicatory stage and a dispositional stage. A different standard of review applies to each stage. In the adjudicatory stage, the burden is on the petitioner to prove by clear, cogent, and convincing evidence that one of the grounds for termination of parental rights set forth in N.C. Gen. Stat. § 7B-1111(a) exists. ... If the petitioner meets its burden of proving at least one ground for termination of parental rights exists under N.C. Gen. Stat. § 7B-1111(a), the court proceeds to the dispositional phase and determines whether termination of parental rights is in the best interests of the child."). Termination of parental rights "completely and permanently terminates all rights and obligations of the parent to the juvenile and of the juvenile to the parent arising from the parental relationship, except that the juvenile's right of inheritance from the juvenile's parent shall not terminate until a final order of adoption is issued." N.C. Gen. Stat. § 7B-1112 (2017). Termination of parental rights makes a child available for adoption by another person, rendering the child a legal stranger to the biological parent. See In re Estate of Edwards , 316 N.C. 698, 706, 343 S.E.2d 913, 918 (1986) ("Adoption effects a complete substitution of families and makes the child legally a stranger to the bloodline of his natural parents."). Termination cuts off the obligation of the parent to pay child support. See In re Tate , 67 N.C. App. 89, 95-96, 312 S.E.2d 535, 540 (1984) ("A parent retains an obligation to pay support up to the actual adjudication of termination of parental rights.").
But the most crucial difference in this case is that a Chapter 50 custody order can always be modified based upon a substantial change in circumstances affecting the best interest of the child, see Shipman , 357 N.C. at 473, 586 S.E.2d at 253, while an order terminating parental rights *399 is permanent and ends all legal rights to the child. See N.C. Gen. Stat. § 7B-1112. After termination, parental rights cannot be restored, no matter what changes may occur in the lives of the parent or the child after the order is entered. See id . In fact, a parent whose rights have been terminated has no standing to legitimate a child, even with the consent of the other parent. See Gorsuch v. Dees , 173 N.C. App. 223, 227, 618 S.E.2d 747, 750 (2005) ("We find unconvincing Petitioner's argument that 'permanent' as used in North Carolina General Statutes section 7B-1112 should be construed as temporary and modifiable to be without merit. Where the statutory language is clear and unambiguous, the Court does not engage in judicial construction but must apply the statute to give effect to the plain and definite meaning of the language. Dictionaries may be used to determine the plain meaning of language. Permanent means 'continuing or enduring (as in the same state, status, place) without fundamental or marked change; not subject to fluctuation *548 or alteration.' We find Petitioner's argument that the 'permanent' termination of his parental rights could allow for modification and restoration to be without merit. In sum, we find Petitioner's argument that the trial court erred in concluding that Petitioner had no standing or right under the law to legitimate A.B.D. because his parental rights had been terminated to be without merit." (citations and quotation marks omitted)). In contrast to termination of parental rights, child custody orders are modifiable "at any time" until the child is 18 years old. See N.C. Gen. Stat. § 50-13.7 (2017) ("Except as otherwise provided in G.S. 50-13.7A, an order of a court of this State for support of a minor child may be modified or vacated at any time , upon motion in the cause and a showing of changed circumstances by either party or anyone interested subject to the limitations of G.S. 50-13.10." (emphasis added)).
Our courts have long recognized that sometimes, a custody order denying a parent all visitation or contact with a child may be in the child's best interest:
Although courts seldom deny visitation rights to a noncustodial parent, a trial court may do so if it is in the best interests of the child:
[T]he welfare of a child is always to be treated as the paramount consideration[.] ... Courts are generally reluctant to deny all visitation rights to the divorced parent of a child of tender age, but it is generally agreed that visitation rights should not be permitted to jeopardize a child's welfare.
*400 Swicegood v. Swicegood , 270 N.C. 278, 282, 154 S.E.2d 324, 327 (1967) (citing Griffin v. Griffin, 237 N.C. 404, 75 S.E.2d 133 (1953) ). See also, In re Custody of Stancil , 10 N.C. App. 545, 551, 179 S.E.2d 844, 848-49 (1971) (" 'The rule is well established in all jurisdictions that the right of access to one's child should not be denied unless the court is convinced such visitations are detrimental to the best interests of the child.' ") (quoting Willey v. Willey , 253 Iowa 1294, 1302, 115 N.W.2d 833, 838 (1962) ). This principle is codified in N.C. Gen. Stat. § 50-13.5(i), which provides that:
In any case in which an award of child custody is made in a district court, the trial judge, prior to denying a parent the right of reasonable visitation, shall make a written finding of fact that the parent being denied visitation rights is an unfit person to visit the child or that such visitation rights are not in the best interest of the child.
Respess v. Respess , 232 N.C. App. 611, 615-16, 754 S.E.2d 691, 696 (2014). The trial court's findings of fact support its conclusion that Father should have no direct contact with Susan. In addition, because of Father's threats to kill Mother, failure to engage in therapy, complete failure to benefit from the DOSE program, and repeated domestic violence with Karen, the trial court did not abuse its discretion in allowing Mother not to inform Father of her and Susan's address.
Father also contends there is no need for the trial court's complete bar of his access to information about Susan, even from third parties such as "teachers, medical professionals, instructors or coaches." While we agree that it is unusual for a parent to have such limited rights regarding his child, the trial court did not abuse its discretion by eliminating his access to information. This restriction of access to information is based upon the specific facts of this case and the trial court described its rationale in detail. In fact, the order on appeal is exceptionally detailed, well-organized, and thorough.
In Finding of Fact 68, which has 23 subsections, the trial court noted the factual basis for the restrictions even to obtaining information from third parties. Father's actions and threats affected many third parties associated with the family, to the detriment of Susan. Mother's employer required her to "work from home because of safety concerns at her employer's office." At the time of the hearing, Mother had been working from home almost a year. Father's threats and actions made third-party *401 professionals trying to help this family sufficiently concerned about their own safety they would not see him unless another person was present and at one point the child's pediatrician stopped seeing her because of Father's actions. The trial court found that Father's "anger and *549 rage" are disturbing and have "had a detrimental impact on not only the minor child to not feel safe around the Defendant but the Plaintiff, her parents, Plaintiff's friends, Plaintiff's co-workers and various professionals involved with this family."
The trial court also made detailed findings regarding Father's failure to follow the requirements of prior orders. Based upon the trial court's findings, if Father could continue to contact third parties such as teachers, physicians, and coaches to get information about the child, based upon his past behavior, it is likely that his anger and threats would make them fearful for their own safety, just as the third parties described in the order were. And to protect their own safety and the safety of their workplaces, these third parties may reasonably refuse to work with Susan, continuing to interfere with her ability to lead a normal life.
Besides endangering the third parties who deal with Susan, allowing Father to contact them to get information about Susan would endanger Mother and Susan directly. Some of Father's actions were unusual and disturbing, such as taking the child to sit in a rental car in a parking garage with him when he was supposed to be visiting in a public place. Father had a car of his own but rented a car and backed into a parking space for these visits, apparently to avoid detection; this surreptitious behavior raises additional concerns. And if he were allowed to get information from third parties, Father would necessarily learn the addresses and locations where Mother and Susan could be found. For example, if Father were permitted to obtain Susan's educational information, he would have to know the name and location of her school, and he would learn from the school records which classes Susan attends and her usual daily schedule; he could then easily find Mother's home simply by following Susan's school bus or following any person who picks her up from school. Under these circumstances, it is in Susan's best interest to prevent Father from having access to information about her education and care because it protects Mother, Susan, and third parties who deal with them. The trial court's detailed and extensive findings of fact support the decretal provisions, including barring Father from obtaining information from third parties.
Father's argument that he would be unable to seek future modification of custody without access to information about Susan is also without merit. Father fails to recognize that the substantial changes which *402 need to occur for him to resume a relationship with Susan are changes that only he can make. We addressed a similar situation in Walsh v. Jones , --- N.C. App. ----, --- S.E.2d ----, 2019 WL 189869 (Jan. 15, 2019) (COA18-496), where several years after a custody order which "immediately and permanently suspended and terminated" all visitation and contact of any sort with defendant-father, the trial court later modified its custody order, allowing the father to resume visitation, although he had not seen or had contact with the child for several years. Id. at ----, --- S.E.2d at ----. The trial court modified his visitation based upon the defendant-father's changes in his own life which addressed the problems which led to the termination of his visitation, finding that the father
completed the [Drug Abuse Research Treatment] program; took various educational classes; consistently passed drug tests; stopped consuming drugs and alcohol; regularly attended church and participated in community service projects; became a member of a volunteer fire department; paid child support from his disability payment; did not have any dealings with any of his pre-incarceration associates; and lives with his mother who is a registered nurse.
Id. at ----, --- S.E.2d at ---- (quotation marks and brackets omitted). Here, as in Walsh , see id. , --- N.C. App. ----, --- S.E.2d ----, Father's lack of access to information about Susan's care does not prevent him from taking the steps he needs to take to have the opportunity to change the custodial arrangement in the future. The order does not prevent Father from taking his medication as prescribed, seeking treatment and counseling to control his anger, ceasing his acts of violence against Karen, and ceasing his threats of violence against Plaintiff and others involved in this case. If Father does *550 the things the trial court has repeatedly ordered him to do throughout this case and can show he has changed and can provide a safe and loving environment for Susan, he has the same opportunity as any parent to request a change in custody based upon a substantial change in circumstances which would positively affect the minor child; his positive behavior could be such a change. See Shipman , 357 N.C. at 473-74, 586 S.E.2d at 253. ("While allegations concerning adversity are acceptable factors for the trial court to consider and will support modification, a showing of a change in circumstances that is, or is likely to be, beneficial to the child may also warrant a change in custody.") This argument is overruled. *403 IV. Conclusion
We affirm.
AFFIRMED.
Judge DILLON concurs with separate opinion.
Judge BERGER dissents with separate opinion.

We will use a pseudonym to protect the privacy of the minor child.

DOSE is the acronym for "Developing Opportunities for a Safe Environment," a domestic violence intervention and education program.

Father attempts to raise other issues in his reply brief, but he has waived these arguments. See State v. Triplett , --- N.C. App. ----, ----, 810 S.E.2d 404, 407-08 (2018) ("Defendant may not use his reply brief to make new arguments on appeal. A reply brief is not an avenue to correct the deficiencies contained in the original brief." (citation, quotation marks, and brackets omitted)).

There was a dissent in Routten , and the case was appealed to the North Carolina Supreme Court; that appeal is still pending.

Routten includes an extensive discussion of In Re Civil Penalty due to the conflict in prior cases issued by this Court. See Routten , --- N.C. App. at ----, 822 S.E.2d at 444-47. Fortunately, the North Carolina Supreme Court now has the opportunity to resolve this conflict in the appeal of Routten .