IN THE COURT OF APPEALS OF NORTH CAROLINA

 2021-NCCOA-453

 No. COA20-320

 Filed 7 September 2021

 Wilkes County, No. 16 CVD 1488

 DANIEL S. ISOM, Plaintiff,

 v.

 JANEE A. DUNCAN, Defendant.

 Appeal by Defendant from order entered 28 May 2019 by Judge Robert J.

 Crumpton in Wilkes County District Court. Heard in the Court of Appeals 13 April

 2021.

 Tharrington Smith, L.L.P., by Steve Mansbery, for plaintiff-appellee.

 Anné C. Wright for defendant-appellant.

 MURPHY, Judge.

¶1 We review custody orders to ensure the findings of fact are supported by

 substantial evidence, and the conclusions of law are supported by the findings of fact.

 When a finding of fact is unchallenged, it is binding on appeal. Here, the trial court

 did not err in concluding that prohibiting the mother from exercising visitation with

 the minor child is in the minor child’s best interests because this conclusion is

 supported by the findings of fact that are supported by substantial evidence in the

 Record.
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 BACKGROUND

¶2 The minor child, Paula,1 was born on 28 January 2011 to Mother Defendant-

 Appellant Janee A. Duncan (“Mother”) and Father Plaintiff-Appellee Daniel S. Isom

 (“Father”). Father and Mother were involved in a romantic relationship before

 Paula’s birth while they were college students in Tennessee but were never married.

 The couple broke up before Paula was born. Father did not meet Paula until

 September 2016, when she was five-and-a-half years old, due to Mother hiding Paula

 from Father and intentionally evading court orders.

¶3 The parties’ custody battle began in January 2012, when the Hamilton County

 Superior Court in Indiana (“Indiana Court”) entered its Order Establishing Paternity,

 Parenting Time, Custody and Support (“January 2012 Order”). The Indiana Court

 awarded joint legal custody of Paula to Mother and Father and ordered physical

 custody to be with Mother. Father was awarded parenting time with Paula pursuant

 to Indiana Parenting Time Guidelines. When Mother refused to grant Father

 visitation time with Paula, the Indiana Court entered an order on 5 March 2012

 requiring Mother to appear and show cause for her failure to comply with the January

 2012 Order. On 31 May 2012, Mother failed to appear at the show cause hearing and,

 1 A pseudonym is used for the minor child throughout this opinion to protect the
 identity of the juvenile and for ease of reading.
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 as a result, the Indiana Court issued a Court Order of Contempt and Writ of Body

 Attachment (“May 2012 Order”).

¶4 For approximately the next four years, Father and his family searched for

 Mother and Paula and were unsuccessful in locating their whereabouts. Father filed

 a verified emergency motion for physical custody and motion to appoint a guardian

 ad litem, which the Indiana Court granted in an order filed 6 September 2016

 (“Indiana September 2016 Order”). In the Indiana September 2016 Order, Father

 was immediately granted temporary physical custody of Paula. Around the same

 time Father was granted temporary physical custody of Paula, Mother fled with

 Paula to Ohio, where she stayed with an acquaintance, Jessica Webb. Mother told

 Webb she “needed a place to stay because the [S]heriff in Hamilton County, Indiana

 came to her house looking for her and [Paula].” After witnessing Mother’s behaviors,

 such as using a “burner phone,” researching fake passports, and making Paula use

 fake names in public, Webb became seriously concerned for Paula’s welfare and

 decided to contact authorities in Indiana and Ohio.

¶5 On 22 September 2016, the Ohio Court of Common Pleas in Washington

 County filed an order (“Ohio September 2016 Order”) finding Mother “appears to be

 a flight risk” and ordering temporary custody of Paula to the Washington County
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 (Ohio) Children Services Board (“Ohio CPS”).2 Father, having moved back to North

 Carolina, filed a lawsuit in Wilkes County District Court on 13 October 2016 for

 custody of Paula and, on the same day, the trial court entered a Temporary Order

 (“October 2016 Order”) awarding Father temporary sole legal and physical custody of

 Paula, subject to Ohio CPS completing an investigation.

¶6 On 31 January 2017, the trial court filed an Interim Order (“January 2017

 Order”) awarding Father temporary legal and physical custody of Paula and

 awarding Mother limited supervised visitation for four hours on the second weekend

 of every month and scheduled phone and video calls with Paula. On 13 October 2017,

 Mother’s visitation was adjusted to a minimum of one hour per week in the trial

 court’s Temporary Custody Order (“October 2017 Order”), which found:

 [Mother’s] actions show that she willfully and intentionally
 kept [Paula] from [Father]. [Mother] willfully and
 intentionally attempted to avoid the jurisdiction of the
 Indiana Courts. [Mother’s] explanations for missing Court,
 moving, not receiving notices, discrepancies in affidavits
 and testimony and using false names are wholly
 unbelievable. Her actions were a conscious effort to keep
 [Father] from [Paula] and were without excuse. [Mother]
 ignored the authority of the Courts in Indiana. She moved

 2 At this point in September 2016, both the Ohio and Indiana courts had been involved

 in the custody dispute and a jurisdictional issue arose that is not at issue in this appeal.
 Ultimately, North Carolina acquired jurisdiction in accordance with a Jurisdictional Order
 filed in Wilkes County District Court on 25 September 2017, recognizing “Wilkes County
 Civil District Court has personal and subject matter jurisdiction in these causes, and has
 authority to enter such Orders as may be necessary regarding modification of custody, child
 support, or otherwise regarding the minor child, [Paula].”
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 to Ohio in an attempt to avoid the Court. She had [Paula]
 use false names to help avoid the Court. [The trial court]
 has no assurances that [Mother] would follow the Orders
 of [the trial court] if given unsupervised visitations.
 [Mother] argues that she has submitted to [the trial
 court’s] jurisdiction and realizes that if she left the State in
 violation of an Order of [the trial court] that she could be
 charged with a felony and arrested. However, the Court in
 Indiana issued at least two separate orders for her arrest
 and she avoided law enforcement and the Court for 5 years.

¶7 Beginning in February 2017, Mother participated in supervised visits with

 Paula at SonShine Child Care Center, Incorporated (“SonShine Child Care”) and Our

 House in Wilkesboro. A visitation supervisor indicated that while most visits with

 Mother and Paula were “appropriate,” Mother violated the Our House guidelines by

 pulling out a camera phone and taking a photograph of a bruise on Paula. Similarly,

 there was an incident on 31 July 2018 at SonShine Child Care where Mother violated

 the facility guidelines when she let an off-duty police officer into the facility despite

 warnings from the staff. In August 2018, Father filed a motion to suspend or

 terminate Mother’s visitation.

¶8 The trial court filed an Order on 28 May 2019 (“May 2019 Order”). The May

 2019 Order decreed “[Father] shall have and exercise the sole legal and physical,

 custody, care and control of [Paula]”; “[Mother] shall not have any visitation with

 [Paula], but she shall be entitled to have phone call or Facetime video call contact

 with [Paula] one time per week each Saturday for 10 minutes [and] . . . a similar call
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 for the same time on each Christmas, Thanksgiving, Easter and birthday of [Paula].”

 Mother timely appealed from the May 2019 Order.

 ANALYSIS

¶9 The ultimate issue on appeal is whether the trial court erred in denying

 visitation between Mother and Paula. “It is a long-standing rule that the trial court

 is vested with broad discretion in cases involving child custody[,]” Pulliam v. Smith,

 348 N.C. 616, 624, 501 S.E.2d 898, 902 (1998), and therefore, “[w]e review an order

 denying visitation for abuse of discretion.” In re J.R.S., 258 N.C. App. 612, 616, 813

 S.E.2d 283, 286 (2018). The reason for an abuse of discretion standard of review is

 because the trial court “has the opportunity to see the parties in person and to hear

 the witnesses . . . . The trial court can detect tenors, tones, and flavors that are lost

 in the bare printed record read months later by appellate judges.” Scoggin v. Scoggin,

 250 N.C. App. 115, 118, 791 S.E.2d 524, 527 (2016) (marks omitted). The trial court’s

 decision will be “reversed for abuse of discretion only upon a showing that its actions

 are manifestly unsupported by reason.” White v. White, 312 N.C. 770, 777, 324 S.E.2d

 829, 833 (1985).

¶ 10 Further, “[i]n a child custody case, the trial court’s findings of fact are

 conclusive on appeal if supported by substantial evidence, even if there is sufficient

 evidence to support contrary findings.” Peters v. Pennington, 210 N.C. App. 1, 12-13,

 707 S.E.2d 724, 733 (2011). “Substantial evidence is such relevant evidence as a
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 reasonable mind might accept as adequate to support a conclusion.” Mitchell v.

 Mitchell, 199 N.C. App. 392, 405, 681 S.E.2d 520, 529 (2009). “Unchallenged findings

 of fact are binding on appeal. Whether the trial court’s findings of fact support its

 conclusions of law is reviewable de novo. If the trial court’s uncontested findings of

 fact support its conclusions of law, we must affirm the trial court’s order.” Scoggin,

 250 N.C. App. at 118, 791 S.E.2d at 526 (marks omitted).

¶ 11 Mother’s ultimate argument on appeal is “[t]he trial court erred in denying

 visitation between [Paula] and her mother.” We disagree with Mother’s contentions,

 especially in light of Finding of Fact 36.

 A. Challenged Findings of Fact

¶ 12 On appeal, Mother challenges Findings of Fact 6, 15, 22, 23, 25, 27, 37, 38, and

 39, as well as Conclusion of Law 4. Specifically, Mother contends Findings of Fact

 23, 25, and 27 are not supported by the evidence in the Record. Mother also mentions

 Findings of Fact 15, 22, 37, and 38 in her brief, but does not argue these findings are

 unsupported by the evidence.

 1. Findings of Fact Challenged as Unsupported by the Evidence

¶ 13 Finding of Fact 23 states:

 23. Once [Paula] was safely returned to the care of [Father]
 in North Carolina, [Mother] did not initially exercise visits.
 Eventually, supervised visitation was set up through
 SonShine Child Care and Our House in Wilkesboro as
 described in the Temporary and Interim Orders in this
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 cause. Visits at both locations became problematic due to
 [Mother’s] behavior and complaints at each location.
 Neither facility will agree to supervise visits any longer in
 this case.

 Mother only challenges the first sentence of Finding of Fact 23–“[o]nce [Paula] was

 safely returned to the care of [Father] in North Carolina, [Mother] did not initially

 exercise visits.” Mother argues she “had no visitation rights to exercise until the

 entry of the trial court’s [January 2017 Order] on 31 January 2017 as the trial court’s

 [October 2016 Order] did not provide for any visitation rights.”

¶ 14 The Record reflects Mother was first granted temporary supervised visitation

 in the January 2017 Order. Mother testified she began supervised visits at Our

 House in February 2017. The January 2017 Order was entered on 31 January 2017

 and, while it is unclear when exactly in February the visits began, it is clear from the

 Record Mother initially exercised her visitation with Paula immediately. The

 challenged sentence of Finding of Fact 23 is unsupported by the evidence, and the

 trial court erred by making this finding. We strike the portion of Finding of Fact 23

 that states: “Once [Paula] was safely returned to the care of [Father] in North

 Carolina, [Mother] did not initially exercise visits.” See State v. Messer, 255 N.C. App.

 812, 825, 806 S.E.2d 315, 324 (2017) (“This portion of the finding is not supported by

 substantial evidence. Accordingly, we strike this portion of the finding.”).
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

¶ 15 However, striking this portion of Finding of Fact 23 does not affect the

 sufficiency of the remaining supported findings of fact to support the trial court’s

 conclusion of law. Omitting this portion of the finding, the trial court’s conclusion of

 law that “[i]t is not in [Paula’s] best welfare and interests that [Mother] exercise any

 visitation” is still supported by the remaining abundant and detailed findings of fact,

 which are supported by substantial evidence as discussed in further detail below. See

 In re E.M., 249 N.C. App. 44, 49, 790 S.E.2d 863, 869 (2016) (“[T]he inclusion of an

 erroneous finding of fact is not reversible error where the [trial] court’s other factual

 findings support its determination.”).

¶ 16 Finding of Fact 25 states, in pertinent part:

 25. Likewise, Tracy Lowder, the Director of SonShine Child
 Care, also testified at [the] hearing. Mrs. Lowder indicated
 that although [Mother] was supplied with the Rules for the
 facility, [Mother] refused to sign them. Mrs. Lowder also
 testified that although [Mother] was appropriate for most
 visits, there were several times when [Mother] had to be
 cautioned regarding rule violations, including bringing
 other persons into the facility who were not supposed to be
 part of the visit, whispering to [Paula], taking photographs,
 and becoming belligerent with staff. Eventually, visits at
 this location were also terminated due to [Mother’s]
 behavior.
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 (Emphasis added).3 In challenging Finding of Fact 25, Mother argues visits at

 SonShine Child Care “stopped after [Mother] moved to North Carolina because the

 visits then became weekly and could all be accommodated by Our House.”

¶ 17 Although visits may have stopped at SonShine Child Care because they

 became weekly and could all be accommodated by Our House, there is substantial

 evidence in the Record to support the finding that visits at SonShine Child Care were

 “also terminated due to [Mother’s] behavior.” (Emphasis added). Tracy Lowder, the

 Director of SonShine Child Care, testified as follows:

 [FATHER’S COUNSEL:] All right. So . . . is it the intention
 of SonShine [Child Care] to offer any further visitation --

 [LOWDER:] No.

 [FATHER’S COUNSEL:] -- at those premises?

 [LOWDER:] No, sir.

 [FATHER’S COUNSEL:] Okay. At least not to [Mother]?

 [LOWDER:] Right.

 [FATHER’S COUNSEL:] And you indicated several things.
 Was the fact that she let a visitor into the premises, is that
 a violation of your policy?

 [LOWDER:] Yes, it’s a huge violation. She’s let a visitor in
 before, but I was able to contain that visitor in a locked
 portion of the building. This visitor came into the
 supervised area portion of the building which is not

 3 Mother only challenges the portion of Finding of Fact 25 that states: “Eventually,

 visits at this location were also terminated due to [Mother’s] behavior.”
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 allowed. I have no way of watching two people at the same
 time. I had to keep my back to this visitor, and I was very
 uncomfortable having her stand behind me the whole time.

 [FATHER’S COUNSEL:] In addition to that, what about
 the discussion and saying things like [Father] is a rapist,
 [Father is] a violent abuser, is [Mother] saying those sorts
 of things in front of [Paula]?

 [LOWDER:] Yes, she was saying those where [Paula] could
 hear what was being said.

 [FATHER’S COUNSEL:] Is that also a violation of your
 policies?

 [LOWDER:] It is.

 [FATHER’S COUNSEL:] And for those reasons alone you
 would not allow her back?

 [LOWDER:] Exactly. Some of the violations that she’s had
 in the past like not volunteering her keys, the cell phone,
 those are minor and they’re not going to harm [Paula]. But
 this attack on a parent, that is very psychologically
 harmful, and so that is something that we can’t tolerate.

 [FATHER’S COUNSEL:] Were you concerned at any point
 that [Mother] was trying to flee the premises with [Paula]?

 [LOWDER:] Yes. By letting a visitor into the building, she
 had no idea that there is another person in the building
 that could assist me with the visitation until she arrived.
 So letting that other person in there was a huge violation
 and was definitely something that I was very concerned
 with. It would have been easy for the two of them to take
 [Paula] out of the premises if I had been by myself.

(Emphases added). This testimony explicitly states Mother was not allowed to

continue visitation at SonShine Child Care because of her behavior and violations of
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 the facility’s rules. While the trial court’s timeline implied by Finding of Fact 25 is

 incorrect, it does not impact the validity of the finding of fact that visits were

 ultimately terminated because of Mother’s behavior.

¶ 18 To the extent that Finding of Fact 25 suggests the initial cessation of visitation

 at SonShine Child Care was due to Mother’s behavior, the finding of fact is

 unsupported by evidence in the Record. However, there is substantial evidence in

 the Record to support the trial court’s finding that “[e]ventually, visits at [SonShine

 Child Care] were also terminated due to [Mother’s] behavior.” (Emphases added).

 Finding of Fact 25 is binding on appeal.

¶ 19 Finding of Fact 27 states:

 27. Two local Wilkesboro police officers investigated the [31
 July 2018] incident and allowed [Paula] to be released into
 the custody of [Father], despite the strong protests of
 [Mother], who made the statement: “I am not leaving
 Wilkes County tonight without my child.” [Mother] then
 insisted that Wilkes DSS be called, and the officers did so.

 (Emphasis added). The 31 July 2018 incident referred to in Finding of Fact 27 is

 detailed in Findings of Fact 25 and 26:

 25. . . . . The last visit at SonShine [Child Care] occurred on
 [31 July 2018]. Just prior to that visit, [Father] had gotten
 married and traveled with his new wife out of town on their
 honeymoon. [Mother] knew [Father] had left for his
 honeymoon . . . . Unbeknownst to SonShine [Child Care]
 staff, [Mother] had hired an off-duty, Hickory police officer
 . . . to show up toward the end of the visit on [31 July 2018].
 Near the end of the visit, [Mother] saw a very small faint
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 bruise on [Paula] . . . and insisted on lifting up [Paula’s]
 shirt and taking a photograph. [Lowder] objected and told
 [Mother] that this was against the Rules of the facility.
 [Mother] persisted so much that [Paula] became very
 upset, “shut down,” and started hiding under the table.

 26. The circumstances of the [31 July 2018] visit was [sic]
 recorded by SonShine [Child Care] security cameras. . . .
 Toward the end of the visit, [Mother] began texting [the off-
 duty police officer] several times, urging her to come to the
 facility. [Mother] then exited the visitation room and began
 going to different doors in an effort to let [the off-duty police
 officer] into the facility, which was also against the rules.
 [Lowder] cautioned [Mother] several times to stop this
 behavior and to not let anyone in, but [Mother] ignored her
 and proceeded to let [the off-duty police officer] come in.
 [Paula] exited the visitation room, came into the hallway,
 and was near the side doorway when [Lowder] grabbed her
 hand and ushered her back into the room. [Lowder] was
 fearful that [Mother] was trying to remove [Paula] from the
 facility. At this point, [Lowder] felt that things were getting
 out of hand and contacted [Father’s] family. [The off-duty
 police officer] had by that time called the local Wilkesboro
 police department. Authorities arrived, as did [Father] and
 his family. During this time, [Mother] was making
 negative comments about [Father] within the hearing of
 [Paula], which is also against SonShine [Child Care] rules.
 [Lowder] read her own Affidavit . . . into evidence at the
 hearing, and the [trial court] incorporates the same by
 reference into these findings of fact.

¶ 20 Mother argues there is no evidence that she made the statement “I am not

 leaving Wilkes County tonight without my child.”

¶ 21 Mother testified to the following:

 [FATHER’S COUNSEL:] Well, you made the statement
 that night that, “I’m not leaving Wilkes County without my
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 daughter”? You made that statement, didn’t you?

 [MOTHER:] Sir, I have that recorded, and I did not make
 that statement at any point in time.

 Father argues that because the trial court found Mother’s testimony to be not

 credible, the trial court can draw the inference that Mother was lying when she

 testified that she did not make the statement, “I’m not leaving Wilkes County without

 my daughter.” Father’s argument does not correctly state the law.

¶ 22 “It is well settled that questions asked by an attorney are not evidence.

 Similarly, a question in which counsel assumes or insinuates a fact not in evidence,

 and which receives a negative answer, is not evidence of any kind.” State v.

 Richardson, 226 N.C. App. 292, 303, 741 S.E.2d 434, 442 (2013) (marks and citations

 omitted). As a result of the fact that Mother denied saying the statement “I’m not

 leaving Wilkes County without my daughter[,]” the Record contains no evidence that

 Mother made the statement “I am not leaving Wilkes County tonight without my

 child” from Finding of Fact 27.

¶ 23 The portion of Finding of Fact 27 that states Mother “made the statement: ‘I

 am not leaving Wilkes County tonight without my child’” is not supported by evidence

 in the Record. However, this portion of Finding of Fact 27 is not essential to the

 ultimate issue on appeal. See In re A.Y., 225 N.C. App. 29, 41, 737 S.E.2d 160, 167

 (“We agree that this [portion of the] finding of fact is [not] supported by competent
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 evidence. . . . This error is, however, harmless.”), disc. rev. denied, 367 N.C. 235, 748

 S.E.2d 539 (2013).

 2. Other Challenged Findings of Fact

¶ 24 Mother also challenges Findings of Fact 15, 22, 37, and 38, but does not argue

 these findings are unsupported by evidence in the Record. Rather, Mother appears

 to argue the trial court erred in using these findings to support its ultimate conclusion

 that “[i]t is not in [Paula’s] best welfare and interests that [Mother] exercise any

 visitation.” “A party abandons a factual [argument] when she fails to argue

 specifically in her brief that the contested finding of fact was unsupported by the

 evidence.” Peters, 210 N.C. App. at 16, 707 S.E.2d at 735. Consequently, Findings of

 Fact 15, 22, 37, and 38 are binding on appeal. Nevertheless, we address each of these

 findings of fact, and Mother’s corresponding argument in her brief, in sequential

 order and conclude they are supported by substantial evidence.

¶ 25 Finding of Fact 15 states:

 15. [Mother] began making various statements to and in
 front of [Webb] which began to alarm [Webb]. For instance,
 [Mother] said several times, and in a serious manner, that
 she regretted not inviting [Father] to her house under the
 pretense of discussing custody, and then killing him and
 making it look like self-defense. [Mother] also admitted to
 [Webb] that she had a gun. [Mother] told [Webb] that she
 “understood how moms could kill their children.” [Mother]
 confided to [Webb] that she was “desperate,” and wanted to
 just drown in the river and die so that she would not have
 to deal with these problems. She described wanting to
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 “float away with [Paula] to be with God.” [Webb]
 interpreted these to be suicidal and homicidal ideations.
 [Webb] became increasingly alarmed about [Mother’s]
 mental health.

¶ 26 Finding of Fact 22 states:

 22. The [trial court] finds that at the time of [Paula’s]
 recovery in Ohio, [Mother] was actively researching for
 ways to flee the United States by use of fake passports and
 ID’s for herself and [Paula]. This is very troublesome for
 the [trial court] since [Mother] had already demonstrated
 a proclivity and ability to readily avoid court orders, arrest
 warrants, and hearings during the 5 ½ years that she had
 [Paula]. Coupled with the fact that [Mother] has
 contemplated killing [Father], has had access to a gun, and
 has had homicidal and suicidal thoughts regarding [Paula]
 and herself, the [trial court] believes [Mother] constitutes
 a significant on-going flight risk with [Paula], as well as a
 potential threat of harm to [Paula] and others.

¶ 27 In her brief, Mother addresses Findings of Fact 15 and 22 together:

 Presumably the comments to which the trial court refers
 [to in Finding of Fact 22] are the one[s] that [Mother] made
 in 2016 as referenced in [Finding of Fact] number 15. No
 doubt many divorced, or otherwise estranged parents, have
 voiced that they would like to kill the other parent of their
 children or that they wish they would die so they didn’t
 have to deal with a problem. Adults often make such
 hyperbolic statements to one another. The ones in this case
 were made several years before the [May 2019 Order] was
 entered and are not indicative of any actual threat to
 [Paula].

 Mother tries to minimize the impact of these statements on the welfare of Paula.

 However, both findings of fact are supported by testimony from Webb that Mother

 said to her “several times, and in a serious manner, that she regretted” not killing
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

Father and making it look like self-defense. (Emphasis added). Webb testified to the

following:

 [FATHER’S COUNSEL:] Would you please tell us about
 any observations by you that [Mother] in any manner
 threatened [Father’s] life?

 [WEBB:] She expressed on more than one occasion that she
 regretted not inviting him to her home under the -- with
 him under the impression that they were going to discuss
 custody or him meeting [Paula]. And she would ask him to
 come into the house and provoke a fight and shoot him and
 kill him.

 And she regretted not doing that. Because she felt like now
 she had to be on the run to avoid him and it would have
 been much simpler if she could have just killed him.

 [FATHER’S COUNSEL:] Okay. So did she describe to you
 a very real and detailed plan to lure [Father] into her home
 so she could pretend that there was some type of attack and
 she would shoot him in self-defense?

 [WEBB:] Yes.

 [FATHER’S COUNSEL:] How many times during her nine-
 day stay with you did she mention that plan?

 [WEBB:] Three or four.

 [FATHER’S COUNSEL:] And how seriously did you take
 that threat?

 [WEBB:] I could tell she was very serious when she said it.
 She said it very casually.

 [FATHER’S COUNSEL:] Like she was unemotional?

 [WEBB:] Yes.
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

[FATHER’S COUNSEL:] And what behaviors did you
observe in [Mother] that made you believe [Mother] would
follow through with a plan like that?

[WEBB:] During the time that she was at my house, she
became increasingly more desperate. And I think that
desperate people do desperate things. And she -- I very
much believed her when she said she regretted not just
what she called, “Doing it the easier way.” Which was
killing him.

[FATHER’S COUNSEL:] Okay. At this point, were you
concerned about the state of [Mother’s] mental health?

[WEBB:] Yes.

[FATHER’S COUNSEL:] And you specifically mentioned
her shooting [Father]. Were you aware that [Mother] had
ever owned a gun?

[WEBB:] Yes. She said that she had a gun in the house.

....

[FATHER’S COUNSEL:] At some point during that nine-
day stay with you, did [Mother] make a comment to you
that she now understood how mothers can kill their
children?

[WEBB:] Yes.

[FATHER’S COUNSEL:] When did she say that?

[WEBB:] It was probably the fifth or sixth day. It was more
than halfway through her stay.

[FATHER’S COUNSEL:] And what prompted that
statement?

[WEBB:] She was talking to [a friend] and I. [The friend]
had come to my house to visit, and we were -- the kids were
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

in bed and we were on the couch, just talking. And
[Mother] was going through different possibilities, “Should
I go to Japan? Should I go to Canada? Should I try to get
a fake passport?” And every option she would say what
complications there would be. “Well, I don’t know how to
get a fake passport.” You know, “I’m going to Google how
to do this.” And, “I don’t know how I would have money to
go to Japan.”

So every suggestion that -- that [Mother] came up with
herself, there was a major problem with. And so she was
just getting upset. . . .

....

[FATHER’S COUNSEL:] At that point in time, were you
fearful for the safety of [Paula]?

[WEBB:] Yes.

....

[FATHER’S COUNSEL:] Did [Mother] make a comment to
you that she wishes that she and [Paula] could just float
away to be with God?

[WEBB:] Yes.

[FATHER’S COUNSEL:] How many times did [Mother]
say that to you?

[WEBB:] Three or four times.

[FATHER’S COUNSEL:] And what did that mean to you?

[WEBB:] It mean [sic] that she wished they could drown in
the river and die and not have to deal with the problems
anymore is what she said. And I have a river in my
backyard. So obviously that was a little specific for my
comfort.
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

¶ 28 The trial court found in Finding of Fact 11 “the testimony of [Webb] [is]

 credible. [Webb] had no reason or motivation to lie or be deceptive with the [trial]

 court.” Mother did not challenge this finding of fact and it is therefore binding. See

 Scoggin, 250 N.C. App. at 118, 791 S.E.2d at 526. Webb’s testimony is substantial

 evidence in the Record to support Findings of Fact 15 and 22. These findings are

 binding on appeal.

¶ 29 Finding of Fact 37 states:

 37. Due to [Mother’s] behaviors, the [trial court] cannot
 allow unsupervised visitation with [Paula]. The [trial
 court] finds that if [Mother] has unsupervised visits with
 [Paula], she will likely flee again with [Paula]. She has
 shown by her past actions that she will not follow Court
 orders.

¶ 30 In her brief, Mother addresses Finding of Fact 37 by arguing:

 The trial court found that “if the mother has unsupervised
 visitation with [Paula], she will likely flee again with
 [Paula].” After [Paula] came into [Father’s] custody,
 [Mother] moved to North Carolina. She began working
 fulltime as a First Steps Domestic Violence Case Manager
 in May 2017 and was still so employed at the time of the
 hearings at issue. She rented a home which was
 appropriate and adequately sized. The trial court found
 that [Mother] evaded service and disobeyed court orders in
 an attempt to keep [Father] out of [Paula’s] life.

 Though [Mother] testified, to the contrary that to her
 knowledge, [Father] never sent any letters, holiday gifts,
 child support or otherwise showed that he wanted to have
 anything to do with [Paula], “it is within the trial court’s
 discretion to determine the weight and credibility that
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 should be given to all evidence that is presented during the
 trial.” Phelps v. Phelps, 337 N.C. 344, 357, 446 S.E.2d 17,
 25 (1994). However, the trial court’s concerns regarding
 the possibility that [Mother] would flee with [Paula] are
 adequately addressed by limiting visitation to supervised
 visitation within the home county. See Brewington v.
 Serrato, 77 N.C. App. 726, 733, 336 S.E.2d 444, 449
 (1985)[.]

 (Record citations omitted). Mother’s argument suggests the trial court could have

 made a different finding in regard to unsupervised visitation and is asking this Court

 to reweigh the evidence in favor of Mother. However, this we cannot do, as our

 authority is limited to determining whether the “trial court’s findings of fact are . . .

 supported by substantial evidence[.]” Peters, 210 N.C. App. at 12, 707 S.E.2d at 733.

 Findings of fact supported by substantial evidence are conclusive on appeal “even if

 there is sufficient evidence to support contrary findings.” Id. at 12-13, 707 S.E.2d at

 733. As Mother acknowledges, it is not for us to reweigh the evidence to determine

 what the trial court could have done.

¶ 31 There is substantial evidence in the Record to support Finding of Fact 37. As

 discussed above, there is credible testimony in the Record to support Finding of Fact

 22, and that finding of fact is binding on us. Finding of Fact 22 states Mother’s past

 and present actions, including her “proclivity and ability to readily avoid court

 orders,” her research about fake passports, her access to a gun, and her mental health

 constitute an “on-going flight risk with [Paula], as well as a potential threat of harm
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 to [Paula].” The trial court did not err in finding “the [trial court] cannot allow

 [Mother to exercise] unsupervised visitation with [Paula]” and “if [Mother] has

 unsupervised visits with [Paula], she will likely flee again with [Paula].” Finding of

 Fact 37 is binding on appeal.

¶ 32 Finding of Fact 38 states:

 38. In a normal situation, the supervisor that [Mother]
 suggested would be appropriate. However, given [Mother’s]
 actions at Our House and Son Shine Child Care, coupled
 with her past actions, lead the [trial court] to conclude that
 it would be impossible for her supervisor to be able to
 control her and prevent her from fleeing with [Paula].

¶ 33 In her brief, Mother quotes Finding of Fact 38 and argues:

 The supervisor suggested by [Mother] was someone
 [Mother] knew from church, Lydia. Lydia was a stay-at-
 home mother with four children, two of whom were
 adopted. There was no evidence indicating in any way that
 Lydia was under a disability or suffered from any other
 condition which would render her unable to alert the
 authorities if [Mother] tried to flee with [Paula].

 (Citations omitted). Again, Mother’s argument suggests we should reweigh the

 evidence in her favor. While the trial court could have pursued a different course of

 action with regard to who would supervise visitation, it chose not to do so, and we

 will not disturb that finding of fact as long as there is substantial evidence in the

 Record to support the finding.
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

¶ 34 Finding of Fact 38 is supported by substantial evidence in the Record,

 including unchallenged Findings of Fact 26 and 36. Finding of Fact 26 states:

 26. . . . . Toward the end of the visit [at SonShine Child
 Care], [Mother] began texting [an off-duty police officer she
 hired] several times, urging her to come to the [SonShine
 Child Care] facility. [Mother] then exited the visitation
 room and began going to different doors in an effort to let
 [the off-duty police officer] into the facility, which was also
 against the rules. [Lowder] cautioned [Mother] several
 times to stop this behavior and to not let anyone in, but
 [Mother] ignored her and proceeded to let [the off-duty
 police officer] come in. [Paula] exited the visitation room,
 came into the hallway, and was near the side doorway
 when [Lowder] grabbed her hand and ushered her back
 into the room. [Lowder] was fearful that [Mother] was
 trying to remove [Paula] from the facility. At this point,
 [Lowder] felt that things were getting out of hand and
 contacted [Father’s] family. [The off-duty police officer]
 had by that time called the local Wilkesboro police
 department. Authorities arrived, as did [Father] and his
 family. During this time, [Mother] was making negative
 comments about [Father] within the hearing of [Paula],
 which is also against SonShine [Child Care] rules.
 [Lowder] read her own Affidavit . . . into evidence at the
 hearing, and the [trial court] incorporates the same by
 reference into these findings of fact.

 Finding of Fact 26 shows that Lowder, a neutral third-party, had a challenging time

 supervising Mother during her visits with Paula and feared Mother would flee with

 Paula. Based on this, there was substantial evidence to support the trial court’s

 finding of fact that “it would be impossible for [Mother’s] supervisor to be able to

 control her and prevent her from fleeing with [Paula].”
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

¶ 35 Finding of Fact 36 also supports Finding of Fact 38. In Finding of Fact 36, the

 trial court found “[Mother] will not follow the orders of [the trial court].” Even if the

 trial court were to allow Mother to choose the supervisor for her visits with Paula,

 this unchallenged finding of fact suggests Mother would not respect and obey the

 supervisor. There is substantial evidence in the Record to support Finding of Fact

 38. This finding of fact is binding on appeal. We now address Mother’s challenged

 conclusions of law.

 B. Challenged Conclusions of Law

¶ 36 Mother challenges Findings of Fact 6 and 39 as at least partial conclusions of

 law. We agree that portions of Finding of Fact 6 and the entirety of Finding of Fact

 39 are more properly labeled as conclusions of law.

 [T]he labels “findings of fact” and “conclusions of law”
 employed by the lower tribunal in a written order do not
 determine the nature of our standard of review. . . . [I]f the
 lower tribunal labels as a finding of fact what is in
 substance a conclusion of law, we review that “finding” as
 a conclusion de novo.

 In re V.M., 273 N.C. App. 294, 298, 848 S.E.2d 530, 534 (2020) (marks and citation

 omitted). “The classification of a determination as either a finding of fact or a

 conclusion of law is admittedly difficult. As a general rule, however, any

 determination requiring the exercise of judgment, or the application of legal
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 principles, is more properly classified a conclusion of law.” In re Helms, 127 N.C. App.

 505, 510, 491 S.E.2d 672, 675 (1997) (citations omitted).

¶ 37 Finding of Fact 6 states, in relevant part:

 6. . . . . [Father] is a loving, fit and suitable custodian for
 [Paula], and it is in the best interests and welfare of [Paula]
 that she remain in the permanent, sole, legal and physical,
 care, custody and control of [Father]. It is not in [Paula’s]
 best welfare or interests that she have any visitation with
 [Mother].

 (Emphasis added).

¶ 38 Finding of Fact 39 states:

 39. Pursuant to [N.C.G.S. §] 50-13.5(i), the [trial court]
 finds that it is not in the best interest of [Paula] to allow
 [Mother] visitation because of the high probability that
 [Mother] will remove and secret [Paula] from the
 jurisdiction of the [trial court].

 (Emphasis added).

¶ 39 Both Findings of Fact 6 and 39 conclude it is not in Paula’s best welfare and

 interests that Mother exercise any visitation. In making this determination, the trial

 court applied legal analysis to the facts and concluded it is not in Paula’s best interest

 to have visitation with Mother. This conclusion required the exercise of judgment

 and is more properly classified as a conclusion of law, rather than a finding of fact.

 See In re J.R.S., 258 N.C. App. at 617, 813 S.E.2d at 286 (marks omitted) (“A

 determination regarding the best interest of a child is a conclusion of law because it
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 requires the exercise of judgment.”); see also Huml v. Huml, 264 N.C. App. 376, 400,

 826 S.E.2d 532, 548 (2019). As Findings of Fact 6 and 39 are more properly classified

 as conclusions of law, we review them de novo to determine whether they are

 supported by the findings of fact.

¶ 40 Mother challenges Findings of Fact 6 and 39 and Conclusion of Law 4 as not

 being “adequately supported by the competent findings of fact.” Similar to Findings

 of Fact 6 and 39, Conclusion of Law 4 states: “It is not in [Paula’s] best welfare and

 interests that [Mother] exercise any visitation.” As Findings of Fact 6 and 39 and

 Conclusion of Law 4 all make the same conclusion, that it is not in Paula’s best

 interests for Mother to exercise visitation, we address them together.

¶ 41 “We review an order denying visitation for abuse of discretion.” In re J.R.S.,

 258 N.C. App. at 616, 813 S.E.2d at 286; see Huml, 264 N.C. App. at 389, 826 S.E.2d

 at 541-42 (“If we determine that the trial court has properly concluded that the facts

 show that a substantial change of circumstances has affected the welfare of the minor

 child and that modification was in the child’s best interests, we will defer to the trial

 court’s judgment and not disturb its decision to modify an existing custody

 agreement.”). A trial court may deny visitation to a noncustodial parent if the parent

 is an unfit person to visit the child or it is in the best interests of the child to deny

 visitation. See N.C.G.S. § 50-13.5(i) (2019) (“[T]he trial judge, prior to denying a

 parent the right of reasonable visitation, shall make a written finding of fact that the
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 parent being denied visitation rights is an unfit person to visit the child or that such

 visitation rights are not in the best interest of the child.”).

 Our courts have long recognized that sometimes, a custody
 order denying a parent all visitation . . . with a child may
 be in the child’s best interest[.] . . . The welfare of a child is
 always to be treated as the paramount consideration.
 Courts are generally reluctant to deny all visitation rights
 to the divorced parent of a child of tender age, but it is
 generally agreed that visitation rights should not be
 permitted to jeopardize a child’s welfare.

 Huml, 264 N.C. App. at 399, 826 S.E.2d at 548; see also In re Stancil, 10 N.C. App.

 545, 551, 179 S.E.2d 844, 848-49 (1971) (emphasis omitted) (“The rule is well

 established in all jurisdictions that the right of access to one’s child should not be

 denied unless the [trial] court is convinced such visitations are detrimental to the

 best interests of the child.”).

¶ 42 The trial court’s findings of fact support its conclusion in Findings of Fact 6

 and 39 and Conclusion of Law 4 that “[i]t is not in [Paula’s] best welfare and interests

 that [Mother] exercise any visitation.” Findings of Fact 6 and 39 and Conclusion of

 Law 4 are supported by ample unchallenged findings of fact in the Record, including

 Findings of Fact 7, 9, 10, 11, 12, 13, 14, 16, 21, 33, 34, 34,4 and 36. Those unchallenged

 findings of fact state:

 7. [Father] first met [Paula] in September of 2016 at the
 Washington County Ohio CPS Office after [Paula] was

 4 The May 2019 Order contains two findings of fact numbered “34.”
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

recovered by authorities after 5 ½ years with [Mother].
[Father] and his family had searched for 5 ½ years for
[Paula] . . . . Prior to September of 2016, [Mother] and her
family had denied all contact of [Father] with [Paula] and
had actually hidden and secreted [Paula] and [Mother]
from [Father] with the logistical and financial aid of
[Mother’s] family. Pending release to the care of [Father]
by Ohio CPS, [Paula] stayed in foster care for a period of
time in Ohio while awaiting a decision by the courts. While
[Paula] was in Ohio CPS custody, [Mother] stated in a
phone call to [Father] on [25 September 2016] that she had
received a spiritual epiphany and now suddenly wanted
[Father] to be involved in [Paula’s] life.

....

9. At the time [Paula] came into the care of [Father],
neither a birth certificate nor a social security number had
ever been issued for [Paula], even though Indiana law
required that a birth certificate be issued within 5 days.
[Mother] intentionally refused to have this done for 5 ½
years. [Father] has now obtained both a delayed certificate
of birth and social security number for [Paula].

10. Since living with [Father], [Paula] has exhibited no
signs of multiple allergies nor needed any treatment for
same, even though [Mother] insisted that [Paula] had
numerous allergies of all types during the 5 ½ years that
she was in [Mother’s] care. [Paula’s] counselor and doctor
testified that these alleged “allergies” were another form of
“control” exercised by [Mother] over [Paula]. During
[these] 5 ½ years, [Mother] also refused to vaccinate
[Paula], or get her dental care, or medical care of any kind.
[Mother] only had [Paula] seen by chiropractors and
“holistic” practitioners. Although the [trial] court realizes
that parents have a right not to immunize their children,
[Mother] gave conflicting testimony about why she refused
to do so, first stating in her Interrogatory Answers that it
was due to egg allergies, and then stating that it was due
to her religious beliefs. [Mother] told Ohio DSS that
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

[Paula] liked to eat eggs. She also told Ohio DSS that
[Paula] had numerous food allergies and sensitivities but
did not mention an egg allergy . . . . The [trial] court finds
that [Mother’s] beliefs that [Paula] had numerous allergies
were completely unfounded, and that she actually
endeavored to keep [Paula] from having medical records in
order to help secret the child. Since acquiring custody,
[Father] has made sure that [Paula] has received all of her
vaccinations, medical check-ups and treatment.

11. The [trial] court heard extensive testimony from
[Father’s] witness, [Webb], by video deposition. [Webb] is
an acquaintance whom [Mother] met in college, but with
whom she had no intervening contact for many years. In
September of 2016, [Webb] was contacted by a mutual
friend named Megan Buskirk, who said that [Mother] and
[Paula] needed a place to stay in Ohio. [Mother’s] mother,
Karen Duncan, then drove [Mother] and [Paula] from
Indiana to Ohio late at night on [12 September 2016]. They
arrived at the Webb home under cover of darkness and
drove straight inside a garage, so they would not be seen.
[Karen Duncan] stayed overnight that night, too. This
sudden trip to Ohio coincided with a recent “body
attachment” and Order for Contempt which had just been
issued by the courts in Indiana for [Mother] and [Paula] on
[30 August 2016]. [Mother] and [Paula] remained at the
Webb home for 9 days, from [12 September] through [21
September 2016]. During this time, [Webb] observed and
communicated with [Mother] and [Paula] extensively. The
[trial] court finds the testimony of [Webb] to be credible.
[Webb] had no reason or motivation to lie or be deceptive
with the [trial] court. She received no compensation or
reward from [Father] or his family. If [Webb] had been
testifying for money, then she would have given [Father]
her information and location immediately when she first
spoke with him. Instead, she waited and provided this
information to [Father’s] father.

12. [Mother] told [Webb] that she needed a place to stay
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

because the [S]heriff in Hamilton County, Indiana came to
her house looking for her and [Paula]. [Mother] also
confided to [Webb] that she did not want to be found in
Indiana. [Mother] told [Webb] that she wanted to keep
[Paula] from [Father] because he and his family were “bad
people.” She regularly referred to them as “the crazies.”
Karen Duncan had said the same thing to [Webb] the night
that Karen stayed at the Webb home. [Mother] told [Webb]
that she knew about court in Indiana and the “body
attachment,” but had no intention of going to Court. She
also knew that [Father] and police were looking for her.
[Mother] was tense and nervous during her stay at the
Webb home. [Webb] did not know at first if what [Mother]
was telling her about [Father’s] family was true or not. The
longer [Mother] stayed, the more [Webb] realized that
[Mother] was lying and/or exaggerating. Although [Webb]
did not want to be involved, she began to become seriously
concerned for the welfare of [Paula] the more she heard
from [Mother] and the more she learned on the internet
about [Paula’s] situation.

13. [Mother] had two cell phones while she was at the Webb
home. [Mother] admitted that one of these phones was a
“burner phone” which was not traceable. During her stay,
[Mother] frequently talked to her lawyer, her mother, and
her sister, Tiffany Duncan Midkiff, on these phones.
[Mother] also admitted to [Webb] that she wanted to flee
the country with [Paula] but could not afford to do so.
[Mother] used the internet at [Webb’s] home to actively
research Japan and Canada and other countries which
would not extradite her and [Paula]. [Mother] also
researched fake passports for herself and [Paula] and
discussed this five or more times with [Webb]. The [trial]
court believes this testimony and does not find that [Webb]
in any manner initiated or encouraged the idea of fleeing
the country with [Paula].

14. During their nine day stay at the Webb home, [Mother]
and [Paula] would not go outside much due to [Mother’s]
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

concern with being discovered. [Mother] admitted that
when she did take [Paula] out in public she made [Paula]
use false names like “Zoe” and “Eleanor.”

....

16. One afternoon [Webb] came home and found both
[Mother] and [Paula] missing. When she searched and
could not find them in the home, she walked down toward
the river and found them walking back from there. When
[Webb] confronted [Mother], [Mother] acted guilty like she
had been “caught.” At this point, [Webb] decided that
[Mother] may pose a real and serious threat to [Paula].
[Webb] then contacted both the Ohio and Indiana Sheriff’s
Departments multiple times. After getting no immediate
response, she contacted [Father’s] family. This ultimately
led to the recovery of [Paula] shortly thereafter by Ohio
authorities. Once [Paula] had been recovered, [Mother]
made the statement to [Webb] that she would “like to kill
whoever turned her in to DSS.”

....

21. [Mother] intentionally violated court orders and
avoided arrest for 5 ½ years. She deliberately concealed
[Paula] with the active aid and support of her family,
including her mother and sister who lied to the Court in
Indiana about the presence of [Mother] and [Paula].
[Mother] testified that both her mother, Karen Duncan,
and her sister, Tiffany Midkiff, lied at a [30 May 2012],
hearing in Indiana regarding the presence of both [Mother]
and [Paula] at their Indiana home. Further, [Mother]
admitted that numerous letters from [Father’s] counsel . .
. which had been sent to the Noblesville address and other
addresses of [Mother] had all been rejected and “returned
to sender.” [Mother] stated that she was actually living at
each address at the time, and that the writing on the letters
to return them was her “mother’s” handwriting. It is
obvious to the [trial court] that [Mother] had to be aware of
the Court proceeding in Indiana on [30 May 2012], since
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

both her mother and sister showed up at that time and
testified. [Mother] testified that her mother and sister did
not tell her they went to the [30 May 2012] hearing until
2015. However, [the trial court] does not believe her. It is
also obvious to the [trial court] that each time the
authorities closed in on [Mother] and her family, that the
family would simply move [Mother] and [Paula] to another
location. In fact, for one 5-month period (from April of 2012
to August of 2012), Karen Duncan paid for [Mother] and
[Paula] to live in extended stay hotels in various areas of
Indianapolis, Indiana, solely to avoid an outstanding body
attachment and court proceedings in Indiana. Since
[Mother] had no regular job or visible means of support, she
was entirely dependent upon her family for the support of
herself and [Paula] during this time. It is also obvious that
[Mother] was in regular contact with her family during this
entire time since she required their regular aid and
assistance.

....

33. Both [Paula’s doctor,] Dr. Wilson[,] and [Paula’s
counselor,] Counselor Griffin[,] further opined that such
deceptive behavior by [Mother] was actually a mechanism
of control over [Paula], as was [Mother’s] breast feeding of
[Paula] until a late age, the self-diagnosis of numerous
false allergies, the refusal to immunize her, the refusal to
allow her to attend school, the refusal to obtain a birth
certificate or social security number, and the refusal to let
her use her real name in public. Not only did these things
all exhibit control, but they also demonstrated in Dr.
Wilson’s words, a disturbing level of “paranoia” and
“narcissism” by [Mother]. Dr. Wilson was particularly
concerned from a medical standpoint that [Mother] had
withheld all medical care and immunizations from [Paula]
for no justifiable reason for 5 ½ years. [Paula] had even
been born at home with no prenatal care from any medical
doctor. Dr. Wilson opined that this was all unnecessary,
dangerous behavior in regard to [Paula]. . . . .
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 34. It is obvious to the [trial court] that [Mother’s] plan to
 conceal [Paula] from [Father] for 5 ½ years included the
 taking of unwarranted and even life-threatening health
 risks for [Paula]. It is equally obvious to the [trial court]
 that [Mother] is still in denial about her responsibility for
 hiding and concealing [Paula] from [Father] for 5 ½ years.
 ....

 34. The [trial court] further believes that [Paula] would
 benefit from some additional counseling to deal with the
 anger issues which she has experienced . . . . Any counselor
 selected by [Father] for such purpose should be provided
 copies of all testing, notes, reports and other information
 which is produced by [Mother’s] psychiatrist. The counselor
 is not required to do so but may also do counseling sessions
 with [Mother] if and when it is deemed necessary or
 advisable by the counselor.

 ....

 36. [Mother’s] continued violations of rules of the
 supervising agencies, Our House and SonShine Child Care,
 shows the [trial court] that she will not follow the orders of
 [the trial court].

 (Emphasis added).

¶ 43 “[I]t is well established by this Court that where a trial court’s findings of fact

 are not challenged on appeal, they are deemed to be supported by competent evidence

 and are binding on appeal.” Cushman v. Cushman, 244 N.C. App. 555, 558, 781

 S.E.2d 499, 502 (2016). Mother has not challenged any of the above-mentioned

 findings of fact, and they are therefore binding on us.

¶ 44 These unchallenged findings of fact and the challenged findings of fact

 supported by substantial evidence demonstrate Mother’s behaviors have been more
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

 harmful than beneficial to Paula and many of Mother’s actions will have life-long

 mental, physical, and emotional consequences for Paula. Further, Mother remains a

 flight risk and refuses to comply with the rules of the visitation agencies. Most

 importantly, Mother has shown and the trial court explicitly found, in Finding of Fact

 36, that she will not follow court orders. We emphasize the importance of this

 unchallenged and binding finding regarding a party’s unwillingness to comply with

 court orders.

¶ 45 While Mother argues “the trial court’s concerns regarding the possibility that

 [Mother] would flee with [Paula] are adequately addressed by limiting visitation to

 supervised visitation within the home county[,]” she fails to acknowledge the fact that

 Mother continues to disobey the rules of the supervising agencies and has continually

 caused disruptions during visitations with Paula. Moreover, unchallenged Finding

 of Fact 30 states, in part, “[Mother’s] actions suggest to the [trial court] that she was

 attempting to get the police or DSS to place [Paula] in her custody that day on [31

 July 2018]” when Mother brought an off-duty police officer to the visitation center

 and caused a disruption. Mother has also historically disobeyed and circumvented

 orders of the courts. The trial court’s determination that limiting visitation to

 supervised visitation within the home county was not feasible is supported by the

 Record.
 ISOM V. DUNCAN

 2021-NCCOA-453

 Opinion of the Court

¶ 46 Considering the evidence and findings that Mother has already demonstrated

 a proclivity and ability to readily avoid court orders, arrest warrants, and hearings

 during the five-and-a-half years she had Paula in her custody, has contemplated

 killing Father, has had access to a gun, and has had homicidal and suicidal thoughts

 regarding Paula and herself, Findings of Fact 6 and 39 and Conclusion of Law 4 are

 supported by the findings of fact in the Record. “It is not in [Paula’s] best welfare and

 interests that [Mother] exercise any visitation.”

 CONCLUSION

¶ 47 The trial court did not err when it denied visitation between Paula and Mother.

 Substantial evidence and unchallenged findings of fact support the findings of fact

 challenged by Mother, and the findings of fact support the trial court’s conclusion of

 law that it is not in Paula’s best interest to have visitation with Mother.

 AFFIRMED.

 Judges INMAN and WOOD concur.