IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-622

No. COA21-387

Filed 20 September 2022

Rutherford County, No. 15CVD549

DONALD DAVIDSON, Plaintiff,

v.

EMILY TUTTLE, Defendant.

Appeal by plaintiff from order entered on or about 19 November 2020 by Judge Robert K. Martelle in District Court, Rutherford County. Heard in the Court of Appeals 22 February 2022.

*Parsons Law, P.A., by Patrick K. Bryan, for plaintiff-appellant.*

*W. Martin Jarrard and Jarald N. Willis, for defendant-appellee.*

STROUD, Chief Judge.

¶ 1          Plaintiff-father appeals the trial court's order reducing his visitation time with his children. Upon careful review, we determine the trial court's findings of fact are supported by the evidence, and those finding support the trial court's determination that a substantial change adversely impacting the welfare of the minor children occurred since the prior custody order and that the modification of the custodial schedule is in the children's best interests. We therefore affirm.

## I.    Background

On or about 4 June 2015, plaintiff-father filed a verified child custody complaint against defendant-mother requesting custody for the parties' two children, Adam and Bryan[1], and moved to establish paternity.   On 19 August 2015, a temporary, non-prejudicial memorandum of judgment was entered ordering a paternity test.   On or about 24 August 2015, defendant-mother filed an answer and counterclaimed for custody.   The paternity testing established plaintiff-father is the children's father.   On 13 May 2016, the trial court entered a custody order granting both parties joint legal custody with defendant-mother having primary physical custody.   Father had visitation beginning in May of 2016 for two hours, twice a week; the children were approximately 14 months old at the time this visitation began. Father's physical custody was set to slowly increase through the months with a specific schedule laid out with changes when the children turned two years old and when they began kindergarten.

On 10 February 2017, Father moved to modify the child custody order arguing "there has been a substantial change in circumstances affecting the custody and visitation of the minor children," including that "the spirit" of the order indicates he should get "more time" with the children as they age; the children are no longer bottle

---

[1] Pseudonyms are used.

fed, and thus they can have more flexible schedules; the children are close with Father; and Mother would be moving her residence five hours away. Thereafter, on 31 December 2018, Father amended his motion to modify, alleging Mother had been dating and when she was not with the children she allowed her parents to keep them rather than him.

¶ 4     On 29 August 2019, the trial court entered a custody order, by consent of the parties.[2] The 29 August 2019 custody order modified the custodial schedule to give Father more physical time with the children, including 14 overnights each month beginning in August of 2019 and running through "school months[.]" On 18 November 2019, Mother filed a verified motion to modify custody alleging a "substantial change in circumstances affecting the welfare of the minor children," because the children "have not adjusted well emotionally to the new schedule[;]" Father has not been involved in preschool or speech therapy; the children often have "physical ailments" after being with Father; Father often has a woman in his home whose "fitness" around the children is "concern[ing;]" and the children are "no longer thriving" as they were under the prior schedule. On 10 February 2020, Mother filed a verified supplement to her motion to modify custody, claiming Father often took the

---

[2] On 1 August 2019, the parties entered a Memorandum of Order with the terms of the revised custodial schedule; the formal order based on the Memorandum was filed on 29 August 2019.

children to his elderly grandfather's house "subjecting" them to 8 hours in the car on weekends in "an unwholesome environment" with "dangerous conditions;" and Father made "disparaging comments about" Mother to the children.

¶ 5        On 19 February 2020, Father answered Mother's motion, denying most of the allegations regarding a substantial change of circumstances and moving for attorney fees.  After a hearing on 12 August 2020 and 24 September 2020, the trial court entered a custody order concluding there had "been a substantial change in circumstances since entry of the August 1, 2019 Consent Order that adversely affects the welfare of the subject minor children and which warrants . . . modification[.]"  The trial court modified Father's visitation to visitation every other weekend from Friday at 3:00pm to Sunday at 3:00pm with specific provisions for some holidays.  Father appeals.

## II.    Modification of Custody Order

¶ 6        Father first contends that "the trial court made *no* findings of fact demonstrating a substantial change in circumstances since entry of the August 1, 2019 custody order" and "there is a lack of substantial evidence to demonstrate any substantial change of circumstances had occurred since the entry of the August 1, 2019 order."  (Emphasis added and capitalization altered.)  Thus, Father contends "the trial court failed to make *any* findings of fact demonstrating a substantial change in circumstances occurred."  (Emphasis added.)

## A. Standard of Review

¶ 7     As our Court has explained,

> In *Shipman v. Shipman*, our Supreme Court set forth the requirements for modification of a custody order, and this Court's standard of review of an order modifying custody. *See Shipman v. Shipman*, 357 N.C. 471, 473-75, 586 S.E.2d 250, 253-54 (2003).
>
> It is well established in this jurisdiction that a trial court may order a modification of an existing child custody order between two natural parents if the party moving for modification shows that a substantial change of circumstances affecting the welfare of the child warrants a change in custody. The party seeking to modify a custody order need not allege that the change in circumstances had an adverse effect on the child. While allegations concerning adversity are acceptable factors for the trial court to consider and will support modification, a showing of a change in circumstances that is, or is likely to be, beneficial to the child may also warrant a change in custody.
>
> As in most child custody proceedings, a trial court's principal objective is to measure whether a change in custody will serve to promote the child's best interests. Therefore, if the trial court does indeed determine that a substantial change in circumstances affects the welfare of the child, it may only modify the existing custody order if it further concludes that a change in custody is in the child's best interests.
>
> The trial court's examination of whether to modify an existing child custody order is twofold. The trial court must determine whether there was a change in

circumstances and then must examine whether such a change affected the minor child. If the trial court concludes either that a substantial change has not occurred or that a substantial change did occur but that it did not affect the minor child's welfare, the court's examination ends, and no modification can be ordered. If, however, the trial court determines that there has been a substantial change in circumstances and that the change affected the welfare of the child, the court must then examine whether a change in custody is in the child's best interests. If the trial court concludes that modification is in the child's best interests, only then may the court order a modification of the original custody order.

When reviewing a trial court's decision to grant or deny a motion for the modification of an existing child custody order, the appellate courts must examine the trial court's findings of fact to determine whether they are supported by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Our trial courts are vested with broad discretion in child custody matters. This discretion is based upon the trial courts' opportunity to see the parties; to hear the witnesses; and to detect tenors, tones, and flavors that are lost in the bare printed record read months later by appellate judges. Accordingly, should we conclude that there is substantial evidence in the record to support the trial court's findings of fact, such findings are conclusive on appeal, even if record evidence might sustain findings to the contrary.

In addition to evaluating whether a trial court's findings of fact are supported by substantial evidence, this Court must determine if the trial court's factual findings support its conclusions of law. With regard to the trial court's conclusions of law, our case law indicates that the trial court must determine whether there has been a substantial change in circumstances and whether that change affected the minor child. Upon concluding that such a change affects the child's welfare, the trial court must then decide whether a modification of custody was in the child's best interests. If we determine that the trial court has properly concluded that the facts show that a substantial change of circumstances has affected the welfare of the minor child and that modification was in the child's best interests, we will defer to the trial court's judgment and not disturb its decision to modify an existing custody agreement.

*Id.* (citations, quotation marks, and brackets omitted).

*Huml v. Huml*, 264 N.C. App. 376, 387–89, 826 S.E.2d 532, 541–42 (2019).

## B. Findings of Fact

Father contests eleven of the trial court's findings of fact as not supported by the "substantial competent evidence." We address the contested findings of fact in two separate sets.

### 1. *Findings of Fact 14-20*

Father challenges findings of fact 14-20. We first note that findings of fact 7-13, and particularly finding of fact 11, address, in some part, the children's

"dysfunctional behavior[,]" and Father's response to it, and thus are helpful for context regarding the challenged findings of fact. Further, findings of fact 7-13 are not contested, and thus those findings are binding on appeal. *See Isom v. Duncan*, 2021-NCCOA-453, ¶ 1 ("When a finding of fact is unchallenged, it is binding on appeal.") We also note the children were born in 2015, so they were four or five years old during the time of the events addressed by these findings of fact.

> 7. Shortly after the entry of the handwritten memorandum of a modified Custody Order on August 1, 2019, which substantially increased the number and frequency of overnights that they spent with the [Father], the subject minor children began acting out in an angry and maladjusted manner, using profanity and saying hateful things to their Mother. This type of dysfunctional behavior on the part of the subject minor children occurred regularly upon their returning to the [Mother]'s home after spending the night with the [Father], and also occurred regularly while the subject minor children were being readied to return to the physical custody of the [Father], and has continued consistently from August 2019 until now.
>
> 8. The [Mother] immediately became alarmed when she noticed this drastic, negative change in the subject minor children's behavior following the entry of the handwritten memorandum of a modified Custody Order on August 1, 2019, and notified the [Father] right away of her serious concerns about the subject minor children's well[-]being.
>
> 9. The [Mother] videoed numerous episodes of this regular dysfunctional behavior on the part of the subject minor children, and presented these videos as evidence in this case. The Court finds that these videoed episodes fairly

and accurately illustrate the described, regularly occurring dysfunctional behavior on the part of the subject minor children.

10. This dysfunctional behavior on the part of the subject minor children, as described in the testimony of the [Mother], the [Mother]'s husband, [Jon Smith], and the [Mother]'s Mother, [Jane Jones], and as illustrated by the representative episodes shown in the videos, cause the Court grave concern for the subject minor children's welfare and emotional well-being.

11. Specific examples of the children's dysfunctional behavior that cause the Court grave concern for the subject minor children's welfare and emotional well-being, and which occurred either upon their returning to the [Mother]'s home after spending the night with the [Father], or while they were being readied to return to the physical custody of the [Father], are as follows:

- On August 25, 2019, upon returning home after spending the night with the [Father], the children screamed at the [Mother], and [Adam] told the [Mother] to "shut your damn mouth;"

- On September 11, 2020, upon returning home after spending the night with the [Father], they screamed at the [Mother] "I hate you" and "you hate me" at least 10 times and [Adam] threw his shoes at his Mother;

- On September 29, 2020, upon returning home after spending the night with the [Father], [Adam] asked "why do you hate me so much?" Mother responded "I do not hate you" and [Adam] said "yes you do;"

- On October 16, 2019, upon returning home after spending the night with the [Father], both of the children were screaming, hitting the couch, throwing stuff, and [Bryan] screamed "I don't have to listen because I don't want to;"

- On November 3, 2019, upon returning home after spending the night with the [Father], [Adam] screamed "I hate you" and he threw things, kicked toys, threw a

blanket;

- On November 13, [201]9, upon returning home after spendi[ng the] night with the [Father] [Adam] screamed "I'm going [to b]e mean to you all day because I want to - Everyone hates me" and . . . when [Mother] told him that she loved him, he responded by calling her a liar. Then [Adam] also screamed "My name is Davidson, I am not a Tuttle. Why do you lie all the time?" And then [Adam] said "I want you to die;"

- On November 18, 2019, upon returning home after spending the night with the [Father], [Adam] wakes up in the middle of the night in a night terror and begins screaming to his Mother "I hate you" when she tries to comfort him;

- On November 20, 2019, upon returning home after spending the night with the [Father], [Bryan] screams at his Mother "I'm going to beat you" and "You're mean to me" [Bryan] also uses profanity and calls his Mother an "asshole" and a "son of a bitch;"

- On Sunday, November 24, 2019, upon returning home after spending the night with the [Father], [Bryan] begins screaming about his jacket, [Bryan] begins kicking and attacks his Mother. [Bryan] screams at his Mother "I hate you." [Bryan]'s scream is a blood-curdling scream, and screams at his Mother that night "I hate you" at least 5 times and then he calls his Mother "a baby."

- On one day in February, 2020, upon returning home after spending the night with the [Father], [Adam] screams at his Mother "you hate me, I'm a bad guy" and "I hate you," and then [Adam] begins punching his Mother.

- On February 19, 2020, upon returning home after spending the night with the [Father], [Adam] calls his Mother a "son of a bitch" and an "asshole" and a "dumb ass motherfucker;"

- On March 8, 2020, upon returning home after spending the night with the [Father], [Bryan] and [Adam] scream repeatedly at their Mother that they "hate her" and [Adam] screams at his Mother that he "wants her to die;" and

- On June 14, 2020, upon returning home after spending the night with the [Father], [Bryan] repeatedly screamed at his Mother "I hate you" and "why do you hate me["] and "you want me to die."

12.    There was also an incident at [Bryan]'s and [Adam]'s school in 2020 before school closed down in March 2020, when [Bryan] and [Adam] surrounded another boy and scared the other boy half to death - they had the other boy on the ground crying and they were threatening to harm this other child.

13.    The [Father] suggested in his testimony that the subject minor children learned this profane language and these abnormal behaviors at school, or that the [Mother] or her family has coached the subject minor children to act this way or to use the profanity to gain an advantage in these court proceedings.

¶ 10    Turning now to the contested findings:

14.    This dysfunctional behavior on the part of the subject minor children was not improperly influenced or manipulated by the [Mother], the [Mother]'s husband, [Jon Smith], or the [Mother]'s Mother, [Jane Jones], and this type of language and hateful conduct toward the [Mother] by the subject minor children was not learned at school.

15.    The subject minor chil[d]'s screaming that their last name wa[s] ["Da]vidson" and not "Tuttle" would not be something they [w]ould learn at school, nor would the expressions of "hatred" toward and about the [Mother] be something they would learn at school.

16.    The [Father], upon being told in August 2019 about this alarming conduct on the part of the subject minor children, was unconcerned and refused to participate in any family counseling to get to the bottom of it.

17.     The [Father] detests and resents the [Mother], and expressed those feelings in no uncertain terms during his testimony at this hearing.

18.     Because of his hostile feelings toward the [Mother], the [Father] refuses to co-parent with the [Mother] to the detriment of the subject minor children.

19.     Based in part on the circumstantial evidence that the subject minor children's use of profanity and saying hateful things to their Mother did not begin until after the entry of the modified Custody Order on August 1, 2019, which modified Custody Order substantially increased the frequency of overnights that the subject minor children spent with the [Father], and based on the circumstantial evidence that the subject minor children could not and did not learn this type of profanity and this expression of hostility toward their Mother from the [Mother] and her family, from classmates at school, or from any other known source, the Court finds that the [Father] has regularly used profanity in the presence of the subject minor children and repeatedly expressed his hostile feelings for the [Mother] in the presence of the subject minor children.

20.     The Court's finding that the [Father] regularly used profanity in the presence of the subject minor children and repeatedly expressed his hostile feelings for the [Mother] in the presence of the subject minor children, is also based, in part, on the direct observations of witness Kandice Brown.

¶ 11     Essentially, findings of fact 14-20, indicate that the children's "dysfunctional behavior" as described in findings of fact 7-20 was caused by their extended time with their Father since entry of the August 2019 order. In making its determination, the trial court explains it used the "direct observations of witness Kandice Brown[,]"

Father's own attitude toward Mother and failure to address the children's troubling behavior, and "circumstantial evidence" such as the fact that neither the school nor Mother's family would teach the children to disown Mother's last name and claim only his.

¶ 12          As to Ms. Brown, Father contends her testimony "is not credible, is not reliable, is full of inconsistences, and is rife with . . . [her] motivation to see [Father] lose his children." But,

> we note that in custody cases, the trial court sees the parties in person and listens to all the witnesses. With this perspective, the trial court is able to observe the demeanor of the witnesses and determine their credibility, the weight to be given their testimony and the reasonable inferences to be drawn therefrom. This opportunity of observation allows the trial court to detect tenors, tones and flavors that are lost in the bare printed record read months later by appellate judges.

*Weideman v. Shelton*, 247 N.C. App. 875, 879–80, 787 S.E.2d 412, 416 (2016) (citations and quotation marks omitted).  Thus, we will not reweigh the trial court's credibility determinations.  Ms. Brown testified to Father's profanity in front of the children and disparaging comments about their Mother.  Father testified he had not heard the boys curse, and the children do not need "counseling" for their behavior. Father speculated Mother had taught the children to call her names and otherwise act out as a "whole conspiracy" for the trial court.

¶ 13          Turning back to the contested findings of fact, ultimately, beyond Father's

speculation, which the trial court plainly did not deem credible, there was no evidence the children's troubles stemmed from Mother, her family members, or the school. Father's testimony verifies he was not fond of Mother and was not concerned about the children's emerging problems, as he found the children's behavior to be "normal," and he did not believe they needed mental health services. Further, Ms. Brown testified Father used profanity and disparaged Mother in front of the children. Accordingly, findings of fact 14-20 were supported by the substantial, competent evidence.

### 2. *Findings of Fact 21-23, 27, and 28*

As to findings of fact 21-23, 27, and 28, Father contends "Findings of Fact 21, 22, 23, 27, and 28 are based upon, and presupposed upon, Findings 19 and 20. Because Findings 19 and 20 are not based upon substantial, competent evidence, Findings 21, 22, 23, 27, and 28 are not." However, we have concluded findings of fact 19 and 20 are based upon substantial competent evidence. Because findings of fact 21, 22, 23, 27, and 28 are challenged only upon the grounds that they were based upon findings of fact 19 and 20, findings which stand, these findings also remain intact.

## C. Substantial Change in Circumstances

Having addressed the challenged findings of fact, we turn back to Father's main argument that "the trial court erred in modifying the August 1, 2019 order

without first sufficiently finding a substantial change of circumstances affecting the welfare of the children had occurred since August 1, 2019." This argument is without merit.

### 1. *Findings of Fact Supporting a Determination of Substantial Change of Circumstances*

¶ 16        We have already noted the findings of fact regarding the changes in the children's behavior after the previous custody order which had substantially increased Father's visitation time. Further, the children were newly emotionally distressed, and Father was unconcerned with these changes. Father is correct that any changes in circumstances "must significantly affect the welfare of the children" before the court may modify the custodial schedule:

> When a trial court modifies a custody order, the requisite change in circumstances cannot be "inconsequential" or "minor," but rather must significantly affect the welfare of the children. *Pulliam*, 348 N.C. at 630, 501 S.E.2d at 905 (Orr, J., concurring). "By this, we mean that the changes are of the type which normally or usually affect a child's well-being—not a change that either does not affect the child or only tangentially affects the child's welfare." *Id.*

*Stephens v. Stephens*, 213 N.C. App. 495, 499, 715 S.E.2d 168, 171 (2011).

¶ 17        Father contends the changes in the children's behavior as found by the trial court are "inconsequential" and "minor[.]" *Id.* Further, Father contends the prior court-ordered modification of custody cannot serve as the substantial change of

circumstances.  But the prior modification of the custody order increasing Father's visitation was not itself the substantial change of circumstances considered by the trial court.  If the children did not have any significant behavioral or emotional changes after the new visitation schedule started, there would be no change of circumstances affecting the children.   The trial court found the children's drastic change in behavior and heightened distress to be the substantial change and that this significantly affected the welfare of the children.  The fact that the substantial changes in the children was apparently caused by more time with their Father does not mean the increase in custodial time in the prior order *was* the substantial change in circumstances.  The trial court's findings regarding the children's drastic change from well-adjusted to "dysfunctional behavior," once they began spending more time with Father, were very detailed.  The troubling behaviors -- in children aged four and five years old -- include screaming and cursing, throwing objects, surrounding another boy and scaring him to the point he was on the ground crying while Adam and Bryan threatened him, and statements from the children about hating Mother, Mother hating one of the children, not having to listen to Mother, purposefully being mean to Mother, disowning Mother's last name, calling Mother profane names, and stating a desire for Mother to die.  These major and consequential changes in the children certainly demonstrate a change of circumstances.  *See id; see generally Huml*, 264 N.C. App. at 387–88, 826 S.E.2d at 541.  However, the substantial change

in circumstances does not end with the children's behavior.

¶ 18        In addition, a parent's intensifying "anger" and "hostility" toward another parent can create a substantial change of circumstances:

> A substantial change in circumstances that affects the welfare of the children can occur when a parent demonstrates anger and hostility in front of the children and attempts to frustrate the relationship between the children and the other parent. Additionally, although interference alone is not enough to merit a change in the custody order, where interference with visitation becomes so pervasive as to harm the child's close relationship with the noncustodial parent, it may warrant a change in custody.

*Stephens*, 213 N.C. App. at 499, 715 S.E.2d at 172 (citations, quotation marks, and brackets omitted). Here, the trial court made several findings regarding Father's expression of "his hostile feelings for" Mother in front of the children, noting it had "influenced the subject minor children and to some degree has contributed to the subject minor children's dysfunctional behavior[.]" Accordingly, the trial court did not err in determining there was a substantial change in circumstances since entry of the prior custody order.

### 2. *Linking the Substantial Change of Circumstances to the Children's Welfare*

¶ 19        Father also contends "[t]he trial court failed to make any finding directly linking any change in circumstances to the welfare of the children" and similarly, "[t]he record and evidence are devoid of substantial evidence to demonstrate any

nexus between any substantial change and the welfare of the children." (Capitalization altered.) In fact, the trial court's order, much of which is quoted above, is a plain declaration of the ways the children's welfare was negatively affected after Father's visitation time increased.

¶ 20          To the extent Father is contending the children's behavior does not impact their welfare, we find this implausible. A child's behavior affects his welfare in many ways because his behavior affects his relationships with others and his opportunities and ability to learn and to make friends. A child who demonstrates the behaviors as described by the trial court's findings at school will likely be unable to make friends and to learn to his full potential, and if the behaviors continue as the child gets older, he could even be suspended from school, at the very least. For example, the incident at school described in finding of fact 12 indicates the children's behavior was causing significant problems at school, not just at home with Mother. Further, children who are ages four and five cannot express their feelings and thoughts as an older child can; with young children, we often must discern the welfare of the child in large part by looking at the child's behavior. Here, the substantial change of the children's behavior upon the modification of custody -- and the absence of any evidence of any other explanation for the change in behavior -- supports the trial court's finding of a link between the increased time with Father and the negative changes in the children.

¶ 21 Lastly, we note, Father does not directly contest the trial court's determination of best interests of the children to return to the prior custodial schedule but instead makes the same argument in slightly different words: "the trial court's conclusion that there was a substantial of circumstances adversely affecting the welfare of children warranting custody modification was not supported by the orders factual findings." (Capitalization altered.) The trial court did not abuse its discretion in determining it was in the best interest of the children to spend less time with Father. *See generally Metz v. Metz,* 138 N.C. App. 538, 541, 530 S.E.2d 79, 81 (2000) ("[W]e hold that the trial court committed no abuse of discretion by concluding that a modification of custody was in Nicholas' best interests.").

### III.    Conclusion

¶ 22 We conclude the trial court properly modified custody based on a substantial change of circumstances impacting the welfare of the minor children.

AFFIRMED.

Judges ARROWOOD and WOOD concur.